IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT COLUMBIA

STEPHEN MATTHEW HOPKINS AND
JULIE R. HOPKINS
    *Plaintiffs*

v.

ANTHONY "TONY" NICHOLS, *in his individual and official capacity*; Sheriff WILLIAM "BILLY" LAMB, *in his individual and official capacity;* *and* BARRY "BO" JACKSON;

CASE NO. _____

JURY TRIAL DEMANDED

# COMPLAINT

Come now the Plaintiffs, STEPHEN MATTHEW HOPKINS and JULIE R. HOPKINS represented by attorneys BRAZIL CLARK, PLLC, and for their complaint would show:

## PRELIMINARY STATEMENT

1. This is a claim for relief pursuant to 42 U.S.C. §1983 for violations of Plaintiffs' right to Due Process pursuant to the Fifth and Fourteenth Amendment to the United States Constitution, Unlawful Seizure in Violation of the Fourth Amendment, and Malicious Prosecution in violation of the Fourth Amendment, all amendments made applicable to the State of Tennessee and those acting under color of state law by the Fourteenth Amendment to the United States Constitution.

## JURISDICTION

2. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because this civil action is brought for the redress of deprivations of constitutional rights as protected by 42 U.S.C. § 1983 and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

## VENUE

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the parties reside in and all incidents, events, and occurrences giving rise to this action occurred in Marshall County, Tennessee.

## PARTIES

4. Plaintiffs Matthew Hopkins and Julie Hopkins (hereinafter referred to as "Plaintiffs") are husband and wife who reside in Giles County, Tennessee, but at all times relevant herein, resided in Marshall County, Tennessee.

5. Defendant Anthony Nichols, (hereinafter referred to as "Detective Nichols") is a detective with the Marshall County Sheriff's Department, and is a citizen and resident of Marshall County, Tennessee. At all times relevant hereto, Mr. Nichols acted under color of law cloaked in the authority of state power derived from his status as a detective with the Marshall County Sheriff's Department.

6. Defendant, William "Billy" Lamb (hereinafter referred to as "Sheriff Lamb") is the Sheriff of Marshall County, Tennessee, and a citizen and resident of

Marshall County, Tennessee. At all times relevant hereto, Sheriff Lamb acted under color of law cloaked in the authority of state power derived from his status as the highest-ranking law enforcement officer for Marshall County. Defendant Lamb is sued in both his individual and official capacity.

7. Defendant Barry "Bo" Jackson is an individual citizen and resident of Lincoln County, Tennessee.

**FACTS**

8. Mr. Hopkins and his wife purchased a farm in Marshall County, Tennessee, in or about April 2015, though they did not actually take possession until approximately August 2015. The seller also sold his herd of approximately thirty (30) cattle.

9. The Plaintiffs supplemented this herd with approximately fourteen (14) cattle brought from their previous home with the intent of producing grass-fed beef on the farm.

10. Prior to July 2, 2018, Detective Nichols claims to have received a complaint regarding animal mistreatment at the Hopkins' farm.

11. On or about July 2, 2018, Detective Nichols and Veterinarian Johnson appeared unannounced at the Hopkins' residence, passing a "NO TRESPASSING" sign well in advance of arriving at the back door of the home. (*Exhibit 1*).

12. Detective Nichols possessed no search warrant and there existed no exigent circumstance excusing the absence of a search warrant, when trespassing onto the Plaintiffs' property.

13. Detective Nichols knocked on the back door to Mr. Hopkins' residence.

14. Mr. Hopkins' wife, Julie Hopkins, who was in the process of feeding her children, opened the door, and was surprised to find the detective and veterinarian.

15. The detective and veterinarian informed her of a dead cow on the property and demanded that she take the veterinarian and Detective Nichols to the herd immediately.

16. Ms. Hopkins asked to be allowed to finish feeding her children, or to wait until her husband returned home, but Detective Nichols denied both requests.

17. Ms. Hopkins then contacted Mr. Hopkins on the phone and informed him that the police were demanding to be taken to the cattle.

18. Mr. Hopkins instructed his wife to follow the officer's commands.

19. Ms. Hopkins led Detective Nichols and Dr. Johnson to the herd, believing she had no other choice.

20. Thirty (30) of the fifty-three (53) cattle on the Hopkins' farm were inherited at the time of the purchase of the farm, and from those thirty (30) cattle from the previous farmer's "old herd," approximately ten (10) of them had visible ribs and spines, which was likely the result of genetics and age.

Some of the cattle also had pink eye (a common and temporary affliction). There was one very sickly, old cow (near the end of the cow's natural life expectancy). The remaining cattle were healthy.

21. On July 2, 2018, Detective Nichols spoke to Mr. Hopkins on Ms. Hopkins' telephone, and Mr. Hopkins informed Detective Nichols that there was one sickly, old cow and mentioned that it was not doing well.

22. Detective Nichols recommended that Mr. Hopkins call a company to properly dispose of the dead cow and to call a veterinarian to inspect the remaining herd.

23. Mr. Hopkins and his wife contacted the carcass removal company immediately and scheduled a veterinarian to come to inspect the herd as soon as possible.

24. The cattle had adequate grazing area, and neither Detective Nichols nor Veterinarian Jill Johnson inspected the entire property to examine the adequacy of pasture for the cattle.

25. The cattle comprising the "old herd" had adequate water supply, including a spring-fed pond in one area and a creek in another. The other herd had an automatic watering trough.

26. Before the veterinarian contacted by Mr. Hopkins was able to visit the farm, Detective Nichols called Mr. Hopkins on July 5, 2018.

27. During the July 5, 2018 phone call, Detective Nichols complained about the fact that the cow carcass was not removed. Mr. Hopkins explained that the company failed to follow through after he requested the removal.

28. On July 9th, 2018, Detective Nichols drove through The Plaintiffs' property. Mr. Hopkins approached Detective Nichols' vehicle and said he did not appreciate Detective Nichols driving around on his property.

29. Detective Nichols stated that "this was an open investigation and I will come out here whenever I want." "You better watch how you talk to me."

30. Detective Nichols then noticed that Mr. Hopkins had three cattle in a catch area and demanded to know why. Mr. Hopkins explained that he was taking them to sell at the Unionville Sale Barn.

31. This information sent Detective Nichols into a rage, and he threatened to arrest Mr. Hopkins on the spot for "violating [Nichols'] order."

32. Dumbfounded, Mr. Hopkins explained that the cattle were not malnourished, and the sale barn would report him if they were. Mr. Hopkins then asked what he could do to fix the problem.

33. Detective Nichols agreed that if Mr. Hopkins were to sell the all the "old" herd (the thirty or so cattle inherited from the previous farm owner), no further action would be taken against him. Mr. Hopkins asked Detective Nichols if he needed to complete the herd check considering that the "old" herd was going to be carried to the sale barn within the week, Detective Nichols said "No."

34. Detective Nichols recommended that Mr. Hopkins contact the auctioneer of the Unionville sale barn to get all the herd off to the sale barn. Detective Nichols provided the auctioneers cell phone number.

35. Mr. Hopkins attempted to call the auctioneer but was unable to make contact.

36. On or about July 11th, 2019, the sickly old cow (previously pointed out by Mr. Hopkins to Nichols) died.

37. Mr. Hopkins contacted Nichols and informed him of the occurrence then contacted the carcass removal company.

38. On July 12, 2018, Detective Nichols contacted Mr. Hopkins and informed him that "we are going out to your property, we just didn't want to scare your wife again." Mr. Hopkins replied, "Well, do what you have to do."

39. The Veterinarian, Jill Johnson, Detective Nichols of the Sheriff's department, and another unknown officer entered Mr. Hopkins' farm, without his consent and without a warrant.

40. At approximately 6:20 a.m. on July 13, 2018, Sheriff Lamb, Detective Nichols, and others arrived at the Plaintiffs' property and commenced the seizure of forty-nine (49) of the Plaintiffs' cattle.

41. Mr. Hopkins approached Detective Nichols and asked, "What did I do?" Detective Nichols responded, "You didn't follow my order, I can take 'em all." Detective Nichols explained that Mr. Hopkins would be charged a fee for the care and feeding of the cattle, or, if Mr. Hopkins did not wish to incur

this fee, he could sign the animals over to Marshall County. Mr. Hopkins refused.

42. Sheriff Lamb arrived sometime after 7:00 a.m. and participated in the raid. The Sheriff's presence and participation in the raid demonstrates that this raid was in accordance with the Marshall County Sheriff's Office's policies and customs and practices.

43. Only after Plaintiffs' numerous requests to learn the location of where the cattle were being held did Detective Nichols tell Mr. and Ms. Hopkins that the animals would be held by Bo Jackson "until the issue was resolved," saying "I never get rid of evidence so they can't be sold."

44. The animals were not at large and posed no risk of escaping or causing a public nuisance.

45. No warrant was procured, and no exigent circumstance existed which would have excused the filing of a warrant.

46. No evidence log was maintained, and no record was kept of precisely how many cattle were taken from Mr. Hopkins.

47. Pre-deprivation process was available for the entire herd, or, at the very least, all but the cattle that were unhealthy or had pink eye, a minor and transient cattle ailment.

48. State law provides the mandatory process due to Mr. Hopkins following the seizure of his cattle:

    (a) Any property subject to forfeiture under this part may be seized by the attorney general, the attorney general's agents, or any law enforcement officer, when acting pursuant to a lawful arrest or search, the execution of

a search warrant, a petition to abate a nuisance, or a court order. When property is seized under this part, it may be removed by the seizing agency or official to a place to secure the property, it may be preserved as evidence, it may be padlocked as ordered by a court of record, it may be secured by depositing in an interest bearing account as approved by a court of record or it may be secured as otherwise authorized by law regarding the maintenance, storage, or disposition of seized property.
- (b) Upon seizure of property for forfeiture under this part, the seizing agency or official shall cause to be delivered a written receipt and notice of seizure to the possessor, owner and interest holder as determined from public records. The notice shall list and describe generally the property seized, the agency or official responsible for the seizure and shall state the procedure for obtaining return of the property. The seizing agency shall deliver a copy of the notice to the district attorney general of the judicial district where the seizing agency is located or of the judicial district where the seizure occurred.
- (c) Upon the seizure of personal property for forfeiture, the seizing agency shall within five (5) working days, apply ex parte for a forfeiture warrant from a judge authorized to issue a search warrant. Upon a finding that probable cause for forfeiture exists, a forfeiture warrant shall issue. The warrant shall be based upon proof by affidavit that there is probable cause that the owner's interest in the seized property is subject to forfeiture. In the event a forfeiture warrant is not issued, then the property shall immediately be returned unless the property is to be retained for evidence in a criminal proceeding. No forfeiture action for personal property may be filed without the issuance of a forfeiture warrant.
- (d) No claim need be filed by an interest holder and no interest holder may have interest forfeited without service of a complaint for forfeiture under this part.

T.C.A. § 39-11-707 (West)

49. T.C.A. § 39-11-707 governs the taking of Plaintiffs' cattle.

50. Detective Nichols failed to obtain a forfeiture warrant within five days.

51. Five days passed by July 18, 2018. Because it had been more than five days since the seizure, state law mandated the return of the cattle to the plaintiffs. Tenn. Code Ann. § 39-11-707.

52. On July 19, 2018, six days after the seizure, detective Nichols swore to forty-nine criminal warrants for Animal Cruelty/Neglect/Abuse against Mr. Hopkins. (*Exhibit 2*).

53. Detective Nichols knew or should have known that there was no probable cause to charge Mr. Hopkins with each and every warrant.

54. Mr. Hopkins obtained an attorney, who requested that the District Attorney inform the Sheriff's department to stay off the Plaintiffs' property without a warrant.

55. On July 31, 2018, a full eighteen (18) days after the seizure, Detective Nichols procured the first of two search warrants for the Hopkins farm. He used this warrant to seize one black cow with a white face and one black calf with pink eye. (*Exhibit 3*).

56. On August 1, 2018, Detective Nichols obtained a second search warrant, which he used to seize yet another black cow with a white face and another calf. (*Exhibit 4*).

57. Mr. Hopkins was never criminally charged for the four cattle seized pursuant to the July 31, 2018 and August 1, 2018 search warrants, and no forfeiture proceedings were ever instituted against him.

58. Detective Nichols knew or should have known that he provided false information in support of all these warrants, particularly when he claimed that many healthy animals were subject to cruelty and neglect within the

meaning of the criminal code, and when he stated that the Plaintiffs disobeyed multiple orders from the veterinarian.

59. The State filed two separate motions requesting a security bond be set for the care of the seized animals. The first of these motions was heard in the General Sessions Court for Marshall County where it was denied based on the violation of Mr. Hopkins' due process rights. The second request for a security bond was filed as a new request, but the case was resolved before it was heard.

60. Due to the costs of upkeep, the cattle were sold during the pendency of the criminal proceedings.

61. The criminal cases were all "retired" on the condition that Mr. Hopkins pay for the care and feeding of the cattle from the proceeds of the cattle's sale. The sale of the cattle didn't cover the entire cost and the state agreed to pay the remaining amount.

62. Upon information and belief, Detective Nichols, Sheriff Lamb, and Defendant Jackson have participated in other seizures of livestock in Marshall County in violation of the due process rights of the citizens.

**FIRST CLAIM FOR RELIEF**

**Violation of the Fourteenth Amendment Right to Procedural Due Process**
**(42 U.S.C. § 1983)**
**(Defendants Nichols and Lamb only)**

63. Plaintiffs repeat and re-allege all paragraphs above, as if fully set forth herein.

64. Tennessee law uses explicitly mandatory language and substantive predicates to protect citizens from deprivation of property without due process. *See* T.C.A. §39-11-707 *above at 48.*

65. Plaintiffs' ownership interest in their cattle is a protected property interest under the Fourteenth Amendment.

66. Defendants' seizure and subsequent sale of Plaintiffs' cattle was a deprivation of Plaintiffs' property interest.

67. In violation of T.C.A. § 39-11-707, Plaintiff received no written notice describing the property seized, the agency or official responsible for the seizure, or a statement of the process for obtaining return of the property.

68. Defendants did not obtain a forfeiture warrant within five working days of the seizure of the animals, as required by T.C.A. § 39-11-707.

69. In violation of T.C.A. § 39-11-707, Plaintiffs' property was not immediately returned to them upon Defendants' failure to obtain a forfeiture warrant.

70. Defendants' failure to follow the statutorily mandated process governing the seizure of Plaintiffs' property deprived Plaintiffs of their procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

71. Defendants Nichols and Defendant Lamb were bound by the mandatory requirements of the forfeiture statute but complied with none of its provisions.

72. The cattle were ultimately sold, and the massive financial debt for their care was forced onto the Plaintiffs by way of a conditional dismissal of Mr. Hopkins' criminal case, should they agree to payment of upkeep costs.

73. As a result of the Defendant's conduct, the Plaintiffs were deprived of fifty-three cattle without due process.

74. Both Plaintiffs were deprived of their constitutionally protected rights to the mandatory procedures set out by T.C.A. § 39-11-707.

75. By completely disregarding the mandatory forfeiture provisions and filing baseless criminal charges six days later, the Defendants violated the Plaintiffs' rights to procedural due process.

76. The case was terminated in favor of Mr. Hopkins by way of retirement.

77. During the pendency of the proceedings, the Plaintiffs visited Defendant Jackson's farm in Lincoln County, Tennessee, where the cows were being held.

78. The conditions of Jackson's farm were visibly worse than the conditions back at the Hopkins farm.

79. Defendants acted under color of law when committing all acts alleged above.

**SECOND CLAIM FOR RELIEF**

**Violation of the Fourth Amendment – Unlawful Search and Seizure**
**(42 U.S.C. § 1983)**
**(Defendants Nichols and Lamb only)**

80. Plaintiffs repeat and re-allege all paragraphs above, as if fully set forth herein.

81. Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment, subject to only a few specific and well-defined exceptions.

82. Defendants entered Plaintiffs' property On July 13, 2018, and seized their cattle, absent a valid warrant issued by a judge or magistrate.

83. Plaintiffs kept their cattle in manner consistent with approved agricultural standards.

84. The condition in which Plaintiffs kept their cattle posed no imminent or ongoing danger to the health of the animals.

85. Defendants' delay in seizing the animals after inspecting them further indicates the lack of an imminent and ongoing danger to the health and safety of the animals.

86. Absent an imminent and ongoing danger to the animals' health, no exigent circumstance existed which would circumvent the need for a constitutionally required warrant.

87. Therefore, the seizure of Plaintiffs' cattle without a valid warrant was in violation of his Fourth Amendment rights.

88. Defendant Nichols knew or should have known that entering onto Plaintiff's property past the "NO TRESPASSING" sign without a warrant

constituted an unlawful search without any exception to the Fourth Amendment's warrant requirement. *(Exhibit 5)*.

89. Defendant Nichols knew or should have known that demanding that Plaintiff Julie Hopkins take him to the herd, denying her the ability to wait until she fed her children or until her husband returned, was an unlawful search because he lacked any exception to the Fourth Amendment's warrant requirement.

90. Defendant Nichols explicitly told Mr. Hopkins that he considered the Hopkins farm an "open investigation" which entitled him to come and go at will.

91. Defendant Nichols knew or should have known that repeated entries onto the Plaintiff's property between July 2 and July 13, 2018, having received only obedience to prior unequivocal demands and unannounced entries, constituted an ongoing search without exception to the Fourth Amendment's warrant requirement;

92. When Detective Nichols ordered the Plaintiff *not* to sell the three healthy cows found in the catch area on July 9th, 2018, conveniently rendering the cows available for seizure four days later, he knew or should have known that this seizure lacked probable cause.

93. Defendant Nichols knew or should have known that he lacked probable cause for any of these actions.

## THIRD CLAIM FOR RELIEF

### Violation of the Fourth Amendment – Malicious Prosecution
### (42 U.S.C. § 1983)

94. Plaintiffs repeat and reallege all paragraphs above, as if fully set forth herein.

95. Defendant Nichols knew or should have known that he made false statements to support forty-nine warrants for animal cruelty, but because he had already missed the deadlines in the state's forfeiture statute, criminal prosecution appeared to him the only manner in which he could plausibly maintain the seizure.

96. Detective Nichols initiated criminal proceedings *vis-à-vis* forty-nine warrants six days after the seizure as a cover for botching the seizure and forfeiture procedure.

97. All forty-nine counts were "retired," which is a dismissal, but the state required that Bo Jackson be paid for the care and feeding of the cattle from the proceeds of their sale.

98. Therefore, the criminal proceedings were favorably disposed.

## FOURTH CLAIM FOR RELIEF
### State Law Conversion
### (Defendant Barry "Bo" Jackson only)

99. Upon information and belief, Defendant Jackson has participated with Detective Nichols and Sheriff Lamb on other livestock seizures conducted in violation of the due process rights of those citizens.

100. Defendant Jackson exercised control and dominion over the Plaintiffs' property for his own use and benefit *vis a vis* the collection of fees for cattle upkeep.

101. Defendant Jackson knew or should have known that the taking of the Hopkins' cattle was in violation of the Plaintiffs' rights.

102. Defendant Jackson exercised disregard for the Plaintiffs' rights by violently wrangling the cattle and holding them at his farm. Several head of cattle were missing at the herd check in December while the cattle were in Jackson's care.

## DAMAGES

103. As a result of each and every of the Defendants' acts above alleged, Plaintiffs have suffered damages, including:

   a. Loss of Consortium (claimed by Plaintiff Julie Hopkins only)

   b. Emotional distress;

   c. Deprivation of constitutionally protected liberty interests;

   d. Deprivation of property;

   e. Humiliation and damage to reputation;

   f. Attorney's Fees;

   g. Loss of enjoyment of life;

   h. Loss of income;

WHEREFORE, Plaintiffs Stephen M. Hopkins and Julie R. Hopkins request:

I. That a jury of 12 persons be empaneled to try this case;

II. A declaratory judgment that Defendants' conduct violated Plaintiffs' protected constitutional rights;

III. Nominal damages;

IV. Compensatory damages;

V. Reasonable attorney's fees and litigation expenses;

VI. Such other and general relief as the court deems just.

Respectfully submitted,

*/s/ Frank R. Brazil*

Frank R. Brazil, #34586
Wesley Clark, #32611
BRAZIL CLARK, PLLC
2706 Larmon Avenue
Nashville, TN 37204
615-730-8619
615-514-9674 (fax)
wesley@brazilclark.com
frank@brazilclark.com