IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT COLUMBIA

| | | |
|---|---|---|
| STEPHEN MATTHEW HOPKINS AND JULIE R. HOPKINS, | ) ) ) | Case No. 1:19-cv-00059 |
| Plaintiffs, | ) ) ) | District Judge Campbell/ Magistrate Judge Holmes |
| v. | ) ) | |
| ANTHONY "TONY" NICHOLS, *in his individual and official capacity*, et al. | ) ) ) | JURY DEMAND |
| Defendants. | ) ) | |

## DECLARATION OF TONY NICHOLS

I, Tony Nichols, having been duly sworn according to law, and based upon my personal knowledge, state as follows:

1. I am over 18 years of age, and I have personal knowledge of the facts contained herein. I was, and currently still am, a detective with the Marshall County Sheriff's Department at the time of the incident alleged in the complaint.

2. On June 29, 2018, I received a call from Deputy Strayley Holton regarding a complaint of a dead cow in a creek. I drove by the farm property and observed the cow being eaten by buzzards in the creek, and I saw other cattle which did not appear in good health.

3. On July 2, 2018, I drove with Dr. Jill Johnson, a veterinarian with the Department of Agriculture, to the Hopkins residence, which is a different property from where the cows were located. As we drove up, the driveway lead to the rear of the

residence where several other vehicles were located, and it appeared that visitors could use the front or back door.

4. After exiting my vehicle, I approached the back door, which appeared to be a primary entryway, and knocked on the door. I advised Mrs. Hopkins of the dead cow still lying in the creek and told her that we would like to look at the other cattle. Mrs. Hopkins called her husband, who told her to do what we asked. Mrs. Hopkins thereafter drove us to the farm property to inspect the cattle. Dr. Johnson and I looked around and took photos. Many of the cattle were in extremely poor condition. They appeared underfed with an insufficient food source. There was no hay and it appeared that the cattle were living solely on the pastures which looked green, but actually consisted of a lot of weeds, which provided only limited nutritional value. Dr. Johnson was also concerned about the fact that there were calves not weaned and in poor health with mothers pregnant again, uncastrated males in the herd which should not have been, inbreeding, and many of the herd suffering from pink eye.

5. During this visit, Mrs. Hopkins called her husband again and I spoke to him directly. Mr. Hopkins advised me that there was an old cow not doing well and that there were about 10 cattle from the "old herd" that showed visible ribs and spines, but that he thought it was due to genetics and age. Dr. Johnson disagreed with this opinion and felt that many of the issues were a lack of knowledge as to basic animal husbandry. My goal, however, was to work with Mr. Hopkins to resolve the issues. I advised Mr. Hopkins that he needed to have someone remove the dead cow, and to see the rest of the herd. I also told him that he needed to go buy hay so that the cattle had a sufficient food supply.

6. Several days later, on July 9, I and a fellow deputy drove to the Hopkins farm property in an effort to follow up on the situation with the cattle. Mrs. Hopkins was

present and again called Mr. Hopkins, who came to the farm. At this time, Mr. Hopkins told me that no veterinarian had yet come to the property to see the cattle and we discussed the possibility of selling all of the cattle. I gave Mr. Hopkins the name and number of an auctioneer that I knew.

7. On July 12, 2018, Dr. Johnson and I called Mr. Hopkins again to follow up on the investigation. At that time, I requested for us to look at the cattle again. Mr. Hopkins advised for us to do what we needed to do, so we drove to the farm property again to look over the herd. Nothing new had really changed. No hay or feed had been purchased. Dr. Johnson and I walked the property and located two skeletal remains in the wooded pasture area and a sinkhole where about a dozen cow carcasses had been illegally disposed. Many of the carcasses still had hide on them. Dr. Johnson specifically determined that the body mass index of many of the cows was low and that there was probable cause for cruelty charges. I began making arrangements that afternoon to locate adequate trailers, equipment, and personnel to round up the cattle as evidence. Prior to the seizure, I did not discuss the specifics of the investigation with my supervisor or Sheriff Lamb. I was not required to seek approval to conduct the seizure.

8. On July 13, 2018, I went to the farm property early in the morning and seized approximately 49 head of cattle. It took several deputies to wrangle the cattle. Sheriff Lamb did come for a brief period and helped to put up one gate outside the property.

9. I also asked Jerry Jackson, who is the President of the Marshall County Cattleman's Association, to help with the round up as there were wild cows and a dangerous bull, and I knew Mr. Jackson was experienced in such round ups. Mr. Jackson also cared for the cattle after the seizure. He treated all of the cattle for pink eye, tagged

them, wormed them, and immunized them. Approximately four of the cows, including two underfed calves, died shortly after the seizure.

10. During all times while investigating the allegations against the Hopkins, I took steps necessary to comply with the requirements of Tenn. Code Ann. § 39-14-211. I relied upon Dr. Jill Johnson, an authorized examiner, to utilize her expertise to determine that probable cause existed to believe that animal cruelty charges were warranted based upon the condition and circumstances of the Hopkins' cattle. At no time have I ever understood the statute to require a warrant to be issued to take livestock into custody as evidence in Tennessee.

I certify under penalty of perjury under the laws of the United States of America and the State of Tennessee that the foregoing is true and correct.

Executed on October 28, 2020

_____
Tony Nichols