IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT COLUMBIA

---

STEPHEN MATTHEW HOPKINS and
JULIE R. HOPKINS,

    Plaintiffs,

v.                   Docket No.: 1:19-CV-00059

ANTHONY "TONY" NICHOLS, in his
individual and official capacity;
and SHERIFF WILLIAM "BILLY" LAMB,
in his individual and official
capacity,

    Defendants.

---

VIDEOCONFERENCE DEPOSITION OF:

STEPHEN HOPKINS

WEDNESDAY, JULY 29, 2020

---

REPORTED BY MICHELLE E.C. HINSON, LCR #193
BERES & ASSOCIATES
Licensed Court Reporters
Post Office Box 190461
Nashville, Tennessee 37219-0461
(615) 742-2550
beresandassociates.com

Q   Okay.  So that's formal education.  Is the
answer the same for any other courses, training,
professional certifications?  You have not engaged in
any of that for agriculture?

A   That is correct.

Q   What's your current address?

A   2200 Fowler Hollow Road, Lynnville, Tennessee,
38472.

Q   And how long have you lived there?

A   I have lived there for a little over a year.

Q   Did you move to that location directly from
Marshall County?

A   Yes.

Q   And what's your Marshall County address?

A   I no longer have a Marshall County address.

Q   Okay.  Well, what was your Marshall County
address?

A   The home or the farm?  I had -- or the
building?  I had three properties in Marshall County.

Q   Okay.  If you could just tell me each of them.

A   Okay.  3706 Mealer Road, Chapel Hill;
3417 Mealer Road, Chapel Hill; 111 First Avenue North,
Lewisburg.

Q   The two Chapel Hill addresses are the farm and
residence; correct?

1    A    Correct.

2    Q    Would you specify which is which?

3    A    3706 is the farm; 3417 was is my residence.

4    Q    What do you estimate to be the distance

5  between those two properties?

6    A    One mile.

7    Q    And you have since sold all three of those

8  properties?

9    A    Yes.

10   Q    Where did you reside prior to Chapel Hill?

11   A    Smyrna.

12   Q    Okay.  What was your -- do you recall your

13 address there?

14   A    I believe 137 Hermitage Drive.

15   Q    And what time period did you live at that

16 location?

17   A    I'm sorry, can you repeat that?

18   Q    What time period did you live at that

19 residence?

20   A    I think October of '95 until I moved to

21 Chapel Hill, and that was about 16 or 17 years ago.

22   Q    So the residence in Chapel Hill you had lived

23 at for about 16 years?

24   A    Yeah, 15, 16 years.  Yes, sir.

25   Q    And you are married; correct?

1    A   She did go to the farm with them, yes, sir, it

2   was my understanding.

3    Q   Do you know what they did that day on the

4   farm?

5    A   Secondhand, but not firsthand.  I did speak to

6   Nichols when he was on the farm on my wife's phone,

7   yes.

8    Q   Was that after all observations had been made,

9   or do you know?

10    A   That was after -- I know it was after they had

11   looked at the dead cow.  Other than that, that's all I

12   know.

13    Q   Okay.  So you were not guiding them through

14   the farm as you were talking to them.  They had seen

15   what they had seen and were then speaking to you?

16    A   That is correct.  Well, my wife called me.  I

17   had talked to her about -- or she called me to tell me

18   what was going on, to give me an update, and I --

19    Q   (Inaudible) -- that first phone call?  I'm

20   sorry.

21    A   Yes, this was at the farm, the second phone

22   call.

23    Q   Okay.

24    A   She's at the farm.  She has called me to give

25   me an update.  I am asking her questions, and she

1    doesn't have any answers, so she gives the phone to

2    Nichols, and I ended up talking to him.

3        Q    Okay.  So there were a total of two phone

4    calls: the first just with your wife, the second with

5    your wife, and then with Detective Nichols?

6        A    Yes, sir, that is correct.

7        Q    Did you speak to Dr. Johnson on the phone that

8    day?

9        A    No, sir, never.

10        Q    Tell me about your conversation with

11    Detective Nichols.

12        A    Okay.  So basically he asked me -- well, he

13    told me that I needed to dispose of the dead cow

14    properly.  I said, "Okay, that's fine."  He told me to

15    either bury it or to call Appertaine and get them out

16    there to remove the dead cow, and he informed me there

17    was no fee for that.  And I said, "Okay.  That's fine.

18    I'll get it taken care of as soon as I get home from

19    work."

20            And then I asked what the problem was, and

21    again he said that there are were some other cattle

22    out here that are poor.  "What do you mean 'poor'?"

23    "Well, I don't know any other way to say it other than

24    they're just poor."  I said, "I don't -- what is the

25    problem you are seeing?"  I didn't understand.

1    So I just kept asking, trying to get an

2  explanation of what was going on, and he finally said,

3  "Well, I think you really need to just get a vet out

4  here to look at the herd and decide which ones to cull

5  and which ones to keep and which ones to get rid of."

6  And I said, "Okay."

7    And so we -- I don't think there was a whole

8  lot more to the conversation and, of course that's all

9  recorded.  You have that, so there's no questions

10  about what happened there, and he gave the phone back

11  to my wife.  And she -- she said she was going to take

12  them out to let them look at the other herd.  I

13  believe I said something to the extent of, "No, no,

14  no.  Don't do that," and she ended the call.

15    Q   Okay.  Taking them to see the other herd.  So

16  they had seen one herd at that point?

17    A   I had no idea.

18    Q   Okay.

19    A   They didn't inform me of that.  I mean, I am

20  sure there were some cattle around there, because if

21  you drive a vehicle into a field, especially a vehicle

22  that they know, which they do the red truck, then some

23  of them are going to come up out of curiosity just to

24  see what's going on.  "What are you doing here?"

25    So I'm certain there were some there, but I

1    recorded, and I didn't have any -- I had no other

2    contact with him on July 2nd.

3        Q    Was your next contact on July 5th?

4        A    I don't recall exactly which day. The next

5    contact I had with him was either on the 3rd or the

6    5th.  I don't recall which.  It was a phone call from

7    him.

8        Q    Okay.  Was it him complaining that the cow had

9    not been removed?  Was that the next contact?

10       A    Yes, sir, that's correct.

11       Q    You don't remember if it was one day after or

12   three days after, but it was --

13       A    It was one of the two.  It was either --

14   obviously it wasn't on July 4th.  I remember that day.

15   So it was either on the 2nd or the -- or sorry, either

16   on the 3rd or the 5th.  I do not recall which.  I'm

17   sure my cell phone records which have been provided

18   would show that, but I don't recall which.

19       Q    So you had dragged the cow to the road at that

20   point.  Is that right?

21       A    I didn't drag it; I put it in the bucket.

22       Q    You transported it.

23       A    Yes, sir, that's correct.  And I had

24   instructed my wife to call Appertaine, which she had

25   done that day, I believe.  I know she did it.  You'd

1    have to ask her for the date, time, whatever.  And
2    Appertaine had not come to collect it yet when I spoke
3    with Nichols.
4        Q    Do you know if they had stated a date at which
5    they would be coming to collect?
6        A    They -- as I recall, from what my wife told
7    me, again, I didn't speak with them directly, but I
8    believe from what she told me they said they would try
9    to get out either this day or that day.  It wasn't
10   a "We will be here this day."  It wasn't like that.
11   It was like, "We will try to be out there then."  You
12   know, in this date range.
13       Q    So when Detective Nichols called you about the
14   cow not being removed, you explained all this to him,
15   that contact had been made and it just had not been
16   picked up yet?
17       A    Yes, sir, I did.
18       Q    Do you know if he had personally seen that the
19   cow was placed at the road?
20       A    I had no idea.
21       Q    Okay.  But through some way, he had knowledge
22   when he called you that it had not been removed?
23       A    That is correct, sir.
24       Q    Did he seem to accept your explanation when
25   you said Appertaine simply had not picked it up yet

1  but had been called?

2      A   No, sir.  He got quite rude with me.

3      Q   Okay.  What was said?

4      A   He basically stated that, "Now, wait a minute.

5  I thought that you were responsible for all the farm

6  items."

7          I said, "I am.  I asked my wife to call to get

8  Appertaine to come out."

9          "So you didn't call Appertaine."

10         "I asked my wife to call."

11         "So now you're saying it's your wife's fault

12  the cow is still out there."

13         "No, I did not.  You need to watch how you

14  talk about my wife.  I don't appreciate that."

15         And he continued to be somewhat belligerent

16  with me, and we ended the phone call basically by -- I

17  said, "Look, I'm" -- I know I said something -- "I'm

18  not trying to be rude, but I don't appreciate you

19  talking about my wife."

20         And he said, "Fine.  I'm not trying to be

21  rude.  I'm just trying to do my job, and all these

22  calls are recorded by Marshall County Sheriff's

23  Department anyway."

24         I said, "Good.  I'm glad to hear it's

25  recorded."  And that was the end of the conversation.

1    Q    So the dead cow was the only topic

2    that they -- it was not discussed as to whether there

3    was any -- no discussion of water, feed, veterinarian

4    care?

5    A    No.  He may -- and I don't remember.  He may

6    have asked me if I had had the vet out yet, and I told

7    him -- again, I think -- I don't remember exactly when

8    that part of the conversation was, whether it was that

9    day or later, but it may have been that day.  I think

10   it was.

11              And I said, "Yes, we called the vet, but he's

12   not been out yet.  He's scheduled to be out."  I

13   believe it was scheduled for the 11th.

14   Q    Was your next communication with

15   Detective Nichols on July 9th?  Does that sound about

16   right?

17   A    Yes, sir, it does.

18   Q    Okay.  And that was in person; correct?

19   A    Yes, sir, it was.

20   Q    Okay.  Can you describe that for me, please?

21   A    Sure.  Nichols trespassed on my farm and

22   scared my wife and kids, and then my wife called me

23   and told me I needed to get out to the farm

24   immediately.  Actually, I was at the house, so I was

25   able to do that.

BERES & ASSOCIATES, COURT REPORTERS

1          And I came out there and Nichols and another

2     officer, I believe Oliver, were coming -- driving from

3     behind the house out into the -- into the driveway

4     when I got there.

5          Q    Were your wife and children in the house on

6     the farm property?

7          A    Yes, that's correct.

8          Q    Okay.  Was this -- were they conducting

9     school?

10         A    No, they had another potential -- I think it

11    was another potential family wanting to join the

12    co-op, and she was showing them around, what our

13    resources were and, you know, if she was interested,

14    this is where we do the homeschooling, you know, the

15    whole computer lab, and that kind of stuff.

16         Q    The vehicle that Detective Nichols was

17    driving, was that a marked vehicle?

18         A    No.  Black Ford truck, four door, four-wheel

19    drive.

20         Q    Do you know if this is the same vehicle that

21    he used on the first occasion?

22         A    I -- I don't know.  I wasn't there.

23         Q    But your wife made no indication to you either

24    way as to whether that was the same or different?

25         A    No, she didn't.  Didn't say one way or the

1   other.

2       Q   So you said that you were at the residence and

3   then came to the farm and then communicated with

4   Detective Nichols at that point; right?

5       A   Yes, that's correct.

6       Q   Okay.  And what was stated in that

7   communication?

8       A   It started by me explaining I didn't

9   appreciate him just coming onto my property without

10  permission and driving around.  And he ended up

11  telling me I better watch how I talked to him, that if

12  I continued that, he would arrest me.  He can come

13  onto this property anytime he wants, it's an ongoing

14  investigation, and I will be arrested if I keep

15  talking to him like that.  That was the first part of

16  the conversation.

17          Then after that we started talking about why I

18  had a trailer attached to my truck, and I informed him

19  that I had taken off -- I forget if it was three or

20  four cattle to the sale barn the previous day, on

21  Sunday afternoon.

22          "All right.  That's it.  You violated my

23  order.  I'll have to arrest you now."

24          "Violated what order?  I don't know what --

25  what order are you talking about?"

1    And he said, "You removed some of these cattle

2    from the property.  I told you you've got to have a

3    vet around here to look at all these."

4    "The vet hasn't come out yet.  I had some that

5    I needed to get up for sale, and I did that."

6    "No, you can't be doing that."

7    We debated rather heatedly for a while, and

8    then I informed him I had another three in the catch

9    area that I was going to come out here and load them

10   and take them today to the sale barn.

11   And he said, "You can either let them out now

12   or I can arrest you, but you're not taking any more

13   cattle off of this property."

14   I said, "Okay.  I'll let them out."  I didn't

15   want to be arrested.

16   He got out of the truck, walked -- I think he

17   had already been out of the truck.  We walked into the

18   catch area; he watched me release the cattle.  Oliver

19   walked in there with us.  He seemed to stay a bit away

20   from us.  And then --

21   Q    Was he closer by for the first conversation?

22   A    Yes, yes, he was closer by for the first

23   conversation.  Like I said, we walked down to the

24   catch area, I released the cattle I had in the catch

25   area, talked a little bit.  He kept telling me the

1    the idea.  And then we left the catch, area and the

2    three of us walked back towards his -- past his truck

3    and stood around the propane tank in the front yard,

4    and we talked some more.

5         And I said, "Okay.  I want to be very clear.

6    I don't want to have another misunderstanding with

7    you."  I was referring to him threatening to arrest me

8    for selling cattle that he said I couldn't sell.  So I

9    said.  "Okay.  Just to be clear, I want to make sure

10   we're on the same page."  And I made sure I got

11   Oliver's attention as well.

12        I said, "Look, I want to make this very clear

13   so there's no misunderstanding.  Do you want me to

14   still have the vet out on Wednesday if I'm going to

15   sell all the cattle on Sunday and Monday?"

16        He said, "Well, if you're going to get rid of

17   them all on Sunday and Monday, then no, you don't need

18   to have the vet come out."

19        I said, "Okay.  That's fine, I just want to

20   make sure we're completely clear about that, and we're

21   good."

22        He said, "Yeah, that's fine.  I don't have a

23   problem with that.

24        I said, "Okay."

25        And then they got in his truck and left.  The

```
 1        Well, initially he was upset because the vet
 2   didn't inspect all of them, and that's what he was
 3   saying on the 9th.  He said these cattle couldn't be
 4   checked because I had taken them to the sale barn.
 5   That's where I was violating his order.  Well, then,
 6   by the end of our conversation he was good with me
 7   getting rid of the old herd completely, and that was
 8   going to satisfy him, and everything was going to be
 9   fine.  We would just go back to our normal lives and
10   just take care of our home herd, and that was fine, I
11   thought.  I mean, I believed him, and so that was my
12   understanding.
13        Q    The three that you had in the catch area, they
14   were all from the old herd; right?
15        A    Yes, sir, that's correct.
16        Q    And he specifically communicated that only the
17   old herd needed to be sold, not all cattle?
18        A    That is correct.  Just the old herd.
19        Q    And you actually made a call to the auctioneer
20   whose number Nichols had given you; correct?
21        A    Yes, sir.
22        Q    Okay.  Did you ever make contact with him?
23        A    No, sir.  I left him a voicemail, and he
24   called me back.  I answered in one ring and -- I mean,
25   like the next day or something he called me back,
```

1    because I had it in my phone.  I knew it was this
2    auctioneer guy, and I immediately answered it, and he
3    hung up.
4            Okay.  Well, maybe it was a bad time, and I
5    didn't want to be rude, and I didn't just call him
6    right back and, "Hey, you know, you just tried to call
7    me."  So I was hoping he would call back, but he never
8    did.
9        Q    So he called you, and when you answered, he
10   hung up?  Is that what you said?
11       A    That's the way I understood it.  I understood
12   that he -- I answered the phone, and I heard "click."
13   So I'm going to say I answered; he hung up.
14       Q    Okay.  So it wasn't the case that you were in
15   the middle of a conversation, and he was --
16       A    No, no, no, I never spoke to him.  I don't
17   want to misconstrue that.  I never spoke to him.  I
18   left a voicemail for him.  He called me back -- I
19   think it was a day later -- and that was it.
20       Q    And you didn't make any further communication
21   with him?
22       A    Not with him, no.
23       Q    Sorry, no further attempted communication, I
24   suppose.
25       A    No, sir, I don't believe I did.  The cell

1    phone records will show it, but I don't think I did.

2        Q    Your next contact with Detective Nichols was

3    on July 11, 2018, and you gave him a call.  Is that

4    right?

5        A    Yes, sir, that's correct.

6        Q    Okay.  And you made that call to let him know

7    that another cow had died?

8        A    Yes, sir.  I had informed him on Monday that

9    we -- I had one cow that I thought was sick, and I had

10   had trouble getting it up a couple times, where I

11·  would come out and it was sitting in the middle of the

12   field, and I would drive the four-wheeler or whatever

13   near it.  Normally you get too close to a cow with a

14   four-wheeler or a truck, it'll get up and move.

15       I came right up to this cow, and it didn't

16   want to get up.  It didn't have a problem with me

17   putting my hand on its side, and that's not good.

18   Cows don't like to be that close.  They'll get close,

19   but they don't want to do that.

20       So at that point I decided -- and I told

21   him at that point I'm just going to start watching it.

22   And so I was going out, you know, every night after

23   work or -- on weekends I was frequently there working

24   on something anyway -- and just checking on it.

25       And I hadn't seen it -- I had seen to go

1  down -- was it -- I guess two times, and that's what I

2  had informed him of, and then -- on Monday.  But I

3  hadn't seen it consistently because I had been able to

4  get it up both times to get it walking, and it seemed

5  okay, but to me it looked like it was an older cow.

6  So I wasn't looking at getting a vet out or anything,

7  you know.  It's just -- it's old.  If it gets -- if

8  there's something obvious wrong, I'll get the vet out,

9  but I'm not seeing some obvious symptom, you know.

10        And so I called on the -- on that day to let

11  him know that, yes, the other cow that I had told him

12  about had died and that I had called Appertaine.  So

13  he knew I was following the law and doing what I was

14  supposed to do.

15        Q    Did you transport the cow to the road that

16  day?

17        A    Yes, sir, I did.

18        Q    And that cow was from the farm herd?

19        A    Yes, sir, it was.

20        Q    No further contact with Detective Nichols on

21  the 11th.  Is that right?

22        A    That is correct, sir.  And I didn't actually

23  have contact with him on that day.  I want it to be

24  clear.  I left a voicemail; I did not speak with him.

25        Q    Okay.  You did not receive a call back that

1  day?

2      A    No, sir, I did not.

3          MR. TISHER:  If we can just go off the record

4  for just a minute?

5          (Pause in proceedings.)

6  BY MR. TISHER:

7      Q    So after July 11th, the voicemail that you

8  left with Detective Nichols, your next contact was on

9  the very next day, the 12th; right?

10      A    Yes, sir.

11      Q    And you received a call from

12  Detective Nichols?

13      A    Yes, sir, I did.

14      Q    What did he state?

15      A    He called me, said, "Well, I need to go back

16  out to your farm, and I'm just calling to let you know

17  because I don't want to scare your wife again," and he

18  asked if she was there.

19          I said, "No, nobody's at the farmhouse right

20  now."

21          He said, "Okay.  Well, I need to go out there

22  and look around."

23          And I said, "Well, do what you have to do."

24  And that was pretty much the end of the conversation.

25  I know he put me on speaker phone shortly after I

answered and took it off speaker. That's all I know. That was the conversation; very brief.

    Q   Did you make any inquiry as to a warrant?

    A   No, sir, I did not. I was already under the impression from the Monday conversation and his specific statement that this is an ongoing investigation, I can go out there whenever I want and, you know, already threatened to arrest me for that. I was hesitant to say anything, and I thought we had already made the deal that I was going to get rid of the old herd, and this was going to go away. So I didn't say anything else to him other than what I told you. Not that I can recall.

    Q   When you say that Monday conversation, you're talking about a few days earlier, on July 9th?

    A   Yes, sir, that's correct.

    Q   Was the topic of a warrant brought up on that date?

    A   No. The topic of him not coming onto my property without my permission was brought up; however, that's when he threatened to arrest me for the way I was talking to him.

    Q   And on July 12th when he told you that he would need to be going to the property to observe again, you did not voice a refusal?

     A    On that day, no, sir.  I just told him, "Do
what you have to do."  I didn't give him permission; I
didn't feel I had a choice in the matter.  He didn't
call me and ask me a question, if he could come onto
my property.  He called me to tell me he was coming
onto my property and wanted to make sure my wife
wasn't there so he wouldn't scare her.

     Q    Were you at your residence at that time?

     A    No, sir.  If I was, I would have gone over
there.

     Q    So you -- you were not present at any time on
the 12th?

     A    No, sir, I was not.  Not while he was there,
if that's what you mean.  I was on the farm on the
12th, I believe, but not while he was there.

     Q    So did you go to the farm later in the day,
after?

     A    Yes, sir.  I went out there to put some feed
out.

     Q    Was any communication made to you on the 12th
as to findings made on the farm?

     A    No.

     Q    When did you become aware that carcasses had
been found on the farm?

     A    I honestly don't remember when I found out.  I

1    I said, What are you talking about?"

2    "You violated my order. I can take them. I'm

3 going to seize them."

4    "What order? What did I not do?"

5    "You didn't have a vet come out here."

6    I said, "You told me I could cancel the vet

7 appointment."

8    And he said, "No, no, no, no, no. No, you

9 violated my order."

10    I said, "Well, are you taking the -- you know,

11 the farm herd?" because that's the one he told me on

12 the 9th that he thought there were problem with. I

13 said, "Are you taking those?"

14    He said, "I'm taking both herds. I'm taking

15 them all."

16    And somewhere in the conversation, I guess it

17 was shortly after, he said, "Okay. Now we're going to

18 start charging you. We're going to charge you $5 a

19 day per head. We're going to charge you for coming

20 out here and catching them. We're going to charge you

21 to tag them. We're going to charge you to vaccinate.

22 We're going to charge you to worm them. We're going

23 to charge you to list -- well, but if you don't want

24 any of these charges, now, I have these papers right

25 here in my truck. You just sign these and they'll be

1  Marshall County's.  You won't have to worry about

2  that."

3          I said, "This is how law enforcement works?

4  This looks like corruption.  What is this?  You're

5  here to steal my cattle and get me to sign to turn

6  them over to you?  No, I'm not doing this."

7          "You really need to think about.  You really

8  need to turn these over.  It's -- costs would run into

9  the thousands in a hurry.  You need to do this."

10         I said, "No.  Do you mind if I call my -- I

11  need to call my lawyer right now."

12         He said, "Okay.  Well, you go do that, and let

13  me know if you want to sign this or not."

14         Somewhere in there, towards the end of the

15  conversation, he said, "Well, I will be arresting you

16  next week for animal cruelty."

17         "Okay."  And I went in my office and called

18  one of my attorneys.

19    Q    Did you speak with the same attorney that

20  represented you in the criminal matter?

21    A    No.

22    Q    Okay.

23    A    I've worked with several attorneys in the

24  course of my business.

25    Q    All right.  So after speaking to

Q   Okay.  And you hadn't been informed that you were going to be arrested, but they were not going to do so on this day?

A   I was told that I would be arrested the next week sometime.  I didn't know when.  This was with conversation -- probably the conversation with Nichols.  And I told him, "All right.  But I'm leaving town on Wednesday.  I don't want you to think I'm trying to run away or anything, but this has been planned for months.  I'm going to be out of town in Texas.  If you need to know where, I'll tell you, but, I mean, I will be back the following week, but I'm going to be gone.  I'm not trying to run away.  I just -- I don't want to mislead you.  I'm trying to figure out how I cannot get in any more trouble here, because I don't understand what's going on."

And he said, "Well, that's fine.  I can hold -- but you'll be back next week?"

I said, "Yeah, I'll be back the week after that."

And he said, "Okay.  I'll call you, and you will need to come in and surrender."

And I said, "That's fine.  You just call me." I said, "Do I need to just go in on Monday?"

He said, "No, I'll call you and let you know."

1          I said, "Okay."

2     Q    Okay.  So the timing of that was purposefully

3  set to be after you had returned from Texas?

4     A    Well, he didn't know if he was going to have

5  them ready beforehand, and I didn't to think he was

6  going to -- didn't want him to think I was running

7  away or something, because I wasn't.  But I had

8  scheduled this for months, that I had to go to work on

9  this job.

10          So that was his -- I guess he didn't think he

11  could get it done by Monday or Tuesday.  I don't know.

12  I just told him I was going to be gone on Wednesday,

13  and so I guess it just -- it just seemed like the

14  logical thing to charge me on Monday.  I don't know

15  how this stuff works.  I've never been arrested or in

16  trouble with the law before.

17     Q    Were you gone Wednesday through Sunday?

18     A    Yeah.  I think I might have left Tuesday.  I

19  think I left Tuesday.  I think I left Tuesday

20  afternoon and -- because it was one of those that's

21  open, I can either leave Tuesday or Wednesday; I just

22  need to be out there working Wednesday.  So I think I

23  left Tuesday and, yeah, I think I came back on Sunday.

24  Either Sunday or Monday I got back.  I don't remember

25  right this second.

1    because I recognized some of them.  I distinctly

2    recognized two of them.

3         Q    When you were alerted that there were some

4    cattle remaining, did that person go and give them any

5    care while you were gone?

6         A    I know he went out there with some grain, I

7    believe, put some grain out for them, yeah.

8         Q    Did those four have water access where they

9    were located on the farm?

10        A    Yeah, everything was open.

11        Q    So after July 13th, did you make -- or did

12   your attorney make communication to the district

13   attorney to inform the Marshall County Sheriff's

14   Department to stay off your property without a

15   warrant?

16        A    No, sir.

17        Q    Okay.  You don't recall any such communication

18   to tell them to stay off the property?

19        A    I retained an attorney, and to my knowledge,

20   he did not communicate with Detective Nichols or

21   anyone else immediately regarding -- regarding staying

22   off the farm.  That occurred when Nichols called me

23   and said that he left cattle there, and he was going

24   to come get them tomorrow and wanted to make sure that

25   I knew he would still be out there.

1    And I said, "No, don't come onto my farm.  You

2  need to speak to my"  -- I don't know if I said,

3  "Don't come onto my farm," or just said, "You need to

4  speak with my attorney."  And I gave him my attorney's

5  name and number.

6    Q    Okay.  But there -- either way, through that

7  communication, you refused consent for him to come

8  back out?

9    A    I had never given him consent in the first

10  place.  I just told him, "Don't come -- don't come out

11  until you talk to my attorneys first."

12    Q    Do you recall when that communication was

13  made?

14    A    I don't remember the date.  I'm certain it's

15  in my cell phone records.

16    Q    And you mentioned this earlier, but

17  thereafter, two search warrants were procured to

18  gather the remaining cattle; correct?

19    A    Yes, sir.

20    Q    Do you know if any of those remaining cattle

21  had pink eye?

22    A    I do not.

23    Q    After the cattle had all been gathered, what

24  was your next communication with Detective Nichols?

25    A    I don't know that I had any further

1  communication with Nichols.  I mean the only other

2  time we ever discussed -- that I had any interaction

3  with Nichols outside of being in the courtroom was he

4  called me on that Monday to tell me to report to the

5  jail, and I did; but I didn't see him there, so again,

6  I had no other interaction.

7       He left me a message saying that he had the

8  warrants ready or whatever, and I needed to go

9  surrender, and I called back and left a voicemail for

10 him stating that I would do it on that Tuesday

11 afternoon after I got out of work.

12    Q   And it was at that point you became aware that

13 you were being charged with animal abuse?

14    A   No.  As I told you earlier, I was informed of

15 that on the 13th.

16    Q   Were the number of counts specified at that

17 time?

18    A   Yes, they were.

19    Q   Okay.  Do you recall how many that was?

20    A   Forty-nine.

21    Q   How did you eventually find out the location

22 of your cattle?

23    A   After numerous, numerous requests and legal

24 inquiries, I was finally told where they were.

25    Q   How were those requests made?

```
1                CERTIFICATE OF REPORTER

2         I, Michelle E.C. Hinson, LCR #193 and Notary

3    Public in and for the State of Tennessee at Large, do

4    hereby certify that the foregoing proceedings were

5    taken at the time and place set forth in the caption

6    hereof; that the witness was duly sworn on oath to

7    testify the truth; that the proceedings were

8    stenographically reported by me in machine shorthand,

9    and that the foregoing proceedings constitute a true

10   and correct transcript of said proceedings to the best

11   of my knowledge, skills, and ability.

12         I further certify that I am not a relative or

13   employee or attorney or counsel of any of the parties

14   hereto, nor a relative or employee of such attorney or

15   counsel, nor do I have financial interest in the

16   outcome or events of this action.

17         IN WITNESS WHEREOF, I have hereunto affixed my

18   official signature and seal this 12th day of

19   August 2020 at Nashville, Davidson County, Tennessee.

20

21                                _____

22                                Michelle E.C. Hinson
                                  Tennessee License No.: 193
23                                License Expires: 6/30/22
                                  Commission Expires: 7/9/2022
24

25
```

| Action Taken | Follow-Up Date |
|---|---|
| PC Determined | |
| | Action Required By |

Comments
From: Dr.Jill Johnson
Sent: Tuesday, July 3, 2018 9:38 AM
To: Samantha Beaty; Sara Clariday; Charles Hatcher
Cc: dettnichols@marshalltn.com
Subject: APEE-B27RP4 Matthew Hopkins in Marshall County Pictures

I determined PC on this case because there was a dead cow in the stream & the majority of the cows in the larger herd had BCS 2-3. The owner was told to promptly remove the dead cow from the stream & properly dispose of it by either burial away from the water sources or by rendering. He was also told that a veterinarian should be called to provide appropriate treatment for the cattle to treat pinkeye & evaluate ages of cattle to assist in culling aged cattle & deworming since no vet care has been provided by the owner in the last 2-3 years.


Jill Johnson DVM

Tennessee Department of Agriculture
PO Box 40627-Melrose Station
Nashville TN 37204
(615) 837-5120
(615) 417-6537 cell

---

_

From: Dr.Jill Johnson
Sent: Friday, July 13, 2018 8:07 AM
To: Samantha Beaty; Sara Clariday; Charles Hatcher
Cc: dettnichols@marshalltn.com
Subject: APEE-B27RP4 Matthew Hopkins in Marshall County -- FOLLOW UP

I was called back yesterday for a recheck on this herd of cattle. I determined PC on 07/02/2018 & there was another cow that has died since that visit. Mr Hopkins was given some recommendations which seems to not been followed. Marshall County sheriff's dept should be on scene today to remove the cattle.
After given permission by phone yesterday by Mr Hopkins to go onto the farm without his presence, we found around 9 additional dead head on the farm.


Jill Johnson DVM

Tennessee Department of Agriculture
PO Box 40627-Melrose Station
Nashville TN 37204
(615) 837-5120
(615) 417-6537 cell

Attachments



AH_LWPCD_HopkinsMarshall070218.pdf  AH_DAD_HopkinsMarshall070218.pdf

**EXHIBIT 1**
Witness: Stephen Hopkins
Date: July 29, 2020
Stenographer: Michelle E.C. Hinson, LCR #193

# IN THE CIRCUIT COURT FOR MARSHALL COUNTY, TENNESSEE

| | | |
|---|---|---|
| *State of Tennessee* | ) | |
| | ) | |
| *v.* | ) | Case No. 18-CR-151 |
| | ) | |
| *Stephen Matthew Hopkins* | ) | |

**Agreed Order of the Parties**

The parties hereby agree to the following:

- All proceeds from the sale of 12/17/18 sale of cattle to be directed to Marshall County General Fund (Rev. Code 4291(?) — to be paid as reimbursement for the care of the animals

- Defendant not to own or possess any livestock for 1 year from date of last seizure (Aug 1, 2018)

- Court costs to be assessed against the State

- All counts to be nolle prosequi by the State

IT IS HEREBY SO ORDERED, this 20 day of _____Dec_____, 2018.

_____
Forest Durard, Circuit Judge

Approved for entry:

_____
Drew Wright, BPR # 29930
Assistant District Attorney

_____
John Colley,
Counsel for Defendant

_____
Stephen Hopkins

**EXHIBIT 2**
Witness: Stephen Hopkins
Date: July 29, 2020
Stenographer: Michelle E.C. Hinson, LCR #193

## Facility Information

| | | |
|---|---|---|
| Facility/Owner Name | Program Area **Animal** | Facility Phone **(615)** |
| Health Office **Tennessee Department of Agriculture** | Grand Division **Middle** | |

| Building # | Direction | Street Name | Type | Suffix | Unit # |
|---|---|---|---|---|---|
| Zip Code | | City | County | | State |
| Country **USA** | | Directions | | | |

## General Details

| | |
|---|---|
| ☐ **Critical** | |
| Complaint Type **Animal Welfare** | Date Received **29-Jun-2018 04:11 PM** |
| Investigation Start Date | Date Closed **02-Jul-2018** |
| Received By **WWW Input** | Referred To **Jill Johnson** |
| Confirmation **No** | Census Tract |

## Complainant Information

☐ Asked to remain a  ☐ Verified

| | | |
|---|---|---|
| Name **Det. Tony Nichols** | Phone #1 **(931)359-6122** | Phone #2 **(931)359-6122** |
| Address **N 209 1St Ave North** | Email **dettnichols@marshall tn.com** | Results Requested ○ No  ○ Yes |
| City **Lewisburg, TN** | State **TN** | Zip Code **37091** |
| Country **USA** | | |

## Animal Welfare Information

| | | |
|---|---|---|
| Animal Type **Cattle** | County of Incident **Marshall** | Date Abuse Witnessed **28-Jun-2018** |
| Owner of Animal(s) reported **Last Name Hopkins** | Street Address of Animal(s) reported **3706 Mealer Road Chapel Hill Tn** | Zip Code of Animal(s) reported **37091** |
| City of Animal(s) reported **Lewisburg, Tn** | State of Animal(s) reported **TN** | Directions including nearest cross street or notable landmarks **209 1St Ave North** |
| Witnessed before date | Feed available? **No** | Water available? **Yes** |

## Complaint Details and Actions

**Complaint Details**

I received a complaint through one of our Deputy's of a heard of cattle which looked poor, one cow was dead and another was down and could not get up. I did observe a dead cow laying in the creek on this property and also approximately 20 head of cattle in the field. The cows did look a little poor but I observed them from the roadway and did not a very good look. I decided to wait for assistance from the Department of Agriculture.

| Action Taken | Follow-Up Date |
|---|---|
| PC Determined | |
| | Action Required By |

Comments

From: Dr.Jill Johnson
Sent: Tuesday, July 3, 2018 9:38 AM
To: Samantha Beaty; Sara Clariday; Charles Hatcher
Cc: dettnichols@marshalltn.com
Subject: APEE-B27RP4 Matthew Hopkins in Marshall County Pictures

I determined PC on this case because there was a dead cow in the stream & the majority of the cows in the larger herd had BCS 2-3. The owner was told to promptly remove the dead cow from the stream & properly dispose of it by either burial away from the water sources or by rendering. He was also told that a veterinarian should be called to provide appropriate treatment for the cattle to treat pinkeye & evaluate ages of cattle to assist in culling aged cattle & deworming since no vet care has been provided by the owner in the last 2-3 years.


Jill Johnson DVM

Tennessee Department of Agriculture
PO Box 40627-Melrose Station
Nashville TN 37204
(615) 837-5120
(615) 417-6537 cell

—

From: Dr.Jill Johnson
Sent: Friday, July 13, 2018 8:07 AM
To: Samantha Beaty; Sara Clariday; Charles Hatcher
Cc: dettnichols@marshalltn.com
Subject: APEE-B27RP4 Matthew Hopkins in Marshall County -- FOLLOW UP

I was called back yesterday for a recheck on this herd of cattle. I determined PC on 07/02/2018 & there was another cow that has died since that visit. Mr Hopkins was given some recommendations which seems to not been followed. Marshall County sheriff's dept should be on scene today to remove the cattle.
After given permission by phone yesterday by Mr Hopkins to go onto the farm without his presence, we found around 9 additional dead head on the farm.


Jill Johnson DVM

Tennessee Department of Agriculture
PO Box 40627-Melrose Station
Nashville TN 37204
(615) 837-5120
(615) 417-6537 cell

Attachments

AH_LWPCD_HopkinsMarshall070218.pdf  AH_DAD_HopkinsMarshall070218.pdf



AH_BCS_HopkinsMarshall070218.pdf   DSCF1505.JPG   DSCF1503.JPG   DSCF1502.JPG   DSCF1499.JPG

DSCF1495.JPG   DSCF1493.JPG   DSCF1492.JPG   AH_LWPCD_HopkinsMarshall071218.pdf

AH_LWPCD_HopkinsMarshall070218.pdf

**Contacts**

**Activity Log**

| User | Activity Log | Activity Date / Time |
|------|-------------|----------------------|
|      |             | 16-Jul-2018 - 03:09:54 PM |

**Supporting Documents**