# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# AT COLUMBIA

| | | |
|---|---|---|
| STEPHEN MATTHEW HOPKINS AND JULIE R. HOPKINS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:19-cv-00059 |
| ANTHONY "TONY" NICHOLS, *in his individual and official capacity,* and SHERIFF WILLIAM "BILLY" LAMB, *in his individual and official capacity*, | ) ) ) ) ) ) | District Judge Campbell/ Magistrate Judge Holmes JURY DEMAND |
| Defendants. | ) ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants, by and through undersigned counsel, hereby submit this statement of undisputed material facts in support of their motion for summary judgment.

1. In or about April of 2015, Plaintiffs purchased a farm in Marshall County, Tennessee, and took possession thereof on or about August of 2015. (First Am. Compl., ¶ 7, D.E. 28).

   **RESPONSE:**

2. Plaintiffs also purchased a herd of approximately thirty (30) cattle from the seller of the farm. (First Am. Compl., ¶ 7, D.E. 28).

   **RESPONSE:**

3. In addition to these cattle, Plaintiffs brought their own herd of approximately fourteen (14) cattle to the farm, intending to raise grass-fed beef. (First Am. Compl., ¶ 8, D.E. 28)

**RESPONSE:**

4. Prior to July 2, 2018, Defendant Nichols received a complaint regarding the treatment of the cattle on Plaintiffs' farm at 3706 Mealer Road in Chapel Hill, Tennessee, specifically that a dead cow was in a creek and that another cow was down in the pasture. ((First Am. Compl., ¶ 9, D.E. 28,); Deposition of Tony Nichols, 53:13–54:4; Deposition of Stephen Matthew Hopkins, 11:16–12:3; Declaration of Tony Nichols, ¶ 2).

**RESPONSE:**

5. Defendant Nichols drove by the farm property and saw the cow in the creek being eaten by buzzards and other cattle that did not appear in good health. (Nichols Decl., ¶ 2).

**RESPONSE:**

6. Plaintiffs' residence featured such conditions, as there were two walkways from the driveway, one to the back door and one to the front, all three of Plaintiffs' vehicles were parked behind the residence, and visitors did indeed use both the front and back doors. (J. Hopkins Depo. at 33:14–24, 34:4–16, 39:18–25; Nichols Decl., ¶ 3).

**RESPONSE:**

7.     Thereafter, on July 2, 2018, Detective Nichols and Tennessee Department of Agriculture Veterinarian Jill Johnson visited Plaintiffs' residence at 3417 Mealer Road in Chapel Hill, Tennessee, informed Mrs. Hopkins of a dead cow on Plaintiffs' farm, and stated that they needed to see Plaintiffs' cattle.  (First Am. Compl. at ¶¶ 10–14, D.E. 28; Nichols Depo. at 54:11–15, 62:3–63:6; Deposition of Julie Hopkins, 39:17–40:19; Deposition of Dr. Jill Johnson, 5:12–6:13; Nichols Decl., ¶ 3).

**RESPONSE:**

8.     Mrs. Hopkins then called Mr. Hopkins to inform him of the situation, and Mr. Hopkins told Mrs. Hopkins to take Detective Nichols and Dr. Johnson to see the cattle.  (First Am. Compl., ¶¶ 16–17, D.E. 28; J. Hopkins Depo. at 41:22–45:4; Nichols Depo. at 64:20–65:22, 67:22–25).

**RESPONSE:**

9.     Mrs. Hopkins did not ask Detective Nichols if she had a choice whether to take them to see the cattle, did not ask about a warrant, and did not refuse to take Detective Nichols and Dr. Johnson to the farm.  (J. Hopkins Depo. at 43:13–22).

**RESPONSE:**

10. Rather, Mrs. Hopkins led Detective Nichols and Dr. Johnson to the cattle on the farm. (J. Hopkins Depo. at 45:6–47:12; First Am. Compl., ¶ 18, D.E. 28).

**RESPONSE:**


11. While on Plaintiffs' farm on July 2, 2018, Mrs. Hopkins, Detective Nichols, and Dr. Johnson observed the dead cow in the creek, and Detective Nichols and Dr. Johnson stated that Plaintiffs would need to dispose of the cow through burial or Appertain, which removes such carcasses at no charge. (Johnson Depo. at 8:25–9:18; J. Hopkins Depo. at 51:5–53:11).

**RESPONSE:**


12. Mr. Hopkins admitted to Detective Nichols that he was not very knowledgeable about caring for cattle. (Nichols Depo. at 73:9–74:17).

**RESPONSE:**


13. Detective Nichols, based on Dr. Johnson's findings, informed Mr. Hopkins that the dead cow needed to be removed from the creek and properly disposed of through burial or calling Appertain, that some of the other cattle appeared to be in poor condition, that a veterinarian needed to examine the cattle for deworming, aging, pinkeye, and general health, and that Plaintiffs needed to feed the cattle. (Nichols Depo. at 73:9–74:17; S. M. Hopkins Depo. at 70:16–72:14; Johnson Depo. at 54:3–20).

**RESPONSE:**

14. Nichols observed that many cattle were underfed with insufficient food source, no hay and fields with limited nutritional value. (Nichols Decl., ¶ 4).

**RESPONSE:**


15. Also, while on Plaintiffs' farm on July 2, 2018, Detective Nichols and Dr. Johnson commented to Mrs. Hopkins that the fields looked "bad" and appeared to have not been cared for in some time. (J. Hopkins Depo. at 56:12–20).

**RESPONSE:**


16. Mrs. Hopkins agreed, stating her belief that the previous owner had not done anything to the "field for a good many years," and that the fields looked "bad" because "[t]here were a lot of weeds in it." (J. Hopkins Depo. at 56:12–25).

**RESPONSE:**


17. Dr. Johnson additionally noticed that older calves did not appear to be properly weaned from their mothers, which could endanger the lives of younger calves. (Johnson Depo. at 62:3–63:3).

**RESPONSE:**


18. Upon the examination of Plaintiffs' cattle by Detective Nichols and Dr. Johnson, Dr. Johnson completed a Livestock Welfare Examination Form dated July 2, 2018. (Johnson Depo. at 18:12–19; Nichols Depo. at Exhibit 10).

**RESPONSE:**

19. In this form, Dr. Johnson stated, "(2) separate herds of mostly Black Angus & Black Baldy cattle. The smaller herd appeared to be in better BCS than larger herd in poorer pasture. The dead cow was located in stream in the pasture with larger number of cattle with lower BCS." (Nichols Depo. at Exhibit 10).

**RESPONSE:**


20. On the same form, Dr. Johnson noted that the body condition scores ("BCS") of the cattle were not indicative of reasonable health for their species, that they lacked access to fresh water, that they lacked access to appropriate forage or feed, that major health/disease issues were present, that the cattle were not receiving timely and appropriate care, and that they were not under veterinary care. (Nichols Depo. at Exhibit 10).

**RESPONSE:**


21. Dr. Johnson provided further clarification in her deposition, stating that the notation of a lack of access to fresh water was based on the dead cow in the creek, the presence of a dry creek with pockets of muddy water, and the existence of a watering trough only accessible to the smaller herd. (Johnson Depo. at 18:12–21:10).

**RESPONSE:**


22. Dr. Johnson also specified that the disease issue in the cattle was active pinkeye and that she concluded that the cattle did not have an adequate food supply. (Johnson Depo. at 27:25–28:19, 29:6–30:22; Nichols Depo. at Exhibit 10).

**RESPONSE:**

23. In the Livestock Welfare Examination Form dated July 2, 2018, Dr. Johnson recommended that Plaintiffs remove dead cow from water source for 1 herd of cattle as soon as possible & properly dispose of the cow by either rendering or burial on property away from water sources. Owners have been told to have a veterinarian examine the cattle & provide appropriate treatment for pinkeye, weight loss such as aging cattle to be able to determine what cattle needed to be culled because of age. (Nichols Depo. at Exhibit 10).

**RESPONSE:**


24. Dr. Johnson also determined, and noted on the same form, that probable cause for animal cruelty was present, as her examination revealed that the cattle "appear[ed] to be subject to . . . [u]nreasonable failure to provide livestock necessary food, water, care, or shelter." (Nichols Depo. at Exhibit 10; Johnson Depo. at 21:11–13, 26:10–18).

**RESPONSE:**


25. More specifically, Dr. Johnson was not concerned with issues involving the cattle's shelter, but she concluded that there was an unreasonable failure to provide the cattle with adequate and acceptable food, water, and veterinary/owner care. (Johnson Depo. at 61:3–62:2).

**RESPONSE:**

26. While Dr. Johnson did not identify body condition scores for each individual head of cattle on July 2, 2018, she did record that the majority of the cows in the larger herd had scores of 2–3 and that many cows in the smaller herd had scores of 3–4, each of which were below the optimal body condition score of 5 on a scale of 1 to 9. (Johnson Depo. at 16:2–15, 57:6–58:13; Nichols Depo. at Exhibit 10; S. M. Hopkins Depo. at Exhibit 2).

**RESPONSE:**


27. According to Dr. Johnson, cattle with a body condition score of 2 to 3 would usually have visible ribs and spines, protruding hipbones, and would be susceptible to disease and parasites. (Johnson Depo. at 57:25–58:11).

**RESPONSE:**


28. On July 9, 2018, Detective Nichols revisited Plaintiffs' farm, with Captain Jimmy Oliver, to see if the cattle were now receiving adequate food and drove up the driveway toward a truck he recognized from Plaintiffs' home and toward a house on the farm that Detective Nichols thought to be abandoned. (Nichols Depo. at 83:2–25, 102:21–25; S. M. Hopkins Depo. at 80:1–4).

**RESPONSE:**


29. Detective Nichols turned his vehicle around in the driveway behind the house, and as he started out, Mrs. Hopkins emerged from the house and spoke to Detective Nichols, informing him that Mr. Hopkins would be there soon. (Nichols Depo. at 83:2–25; J. Hopkins Depo. at 74:2–9).

**RESPONSE:**

30. When Mr. Hopkins arrived, Detective Nichols informed him that he and Captain Oliver were checking on the cattle to see if they were receiving feed, but the conversation then shifted to the transportation and sale of the cattle. (Nichols Depo. at 85:6–86:6; S. M. Hopkins Depo. at 81:17–82:15).

**RESPONSE:**

31. Detective Nichols informed Mr. Hopkins that even if he were selling the cattle, he would nonetheless need to provide feed and care for the cattle while they were still present on Plaintiffs' farm. (Nichols Depo. at 85:6–25, 88:6–23).

**RESPONSE:**

32. Detective Nichols provided Mr. Hopkins the phone number of an individual who could haul many more cattle at once. (Nichols Depo. at 85:6–86:6; S. M. Hopkins Depo. at 87:19–21).

**RESPONSE:**

33. Next, on July 11, 2018, Mr. Hopkins called Detective Nichols and left him a voicemail stating that a cow Mr. Hopkins had previously suspected to be sick had died and that Mr. Hopkins had contacted Appertain for its removal. (S. M. Hopkins Depo. at 89:2–90:24).

**RESPONSE:**

34. Detective Nichols called Mr. Hopkins back the following day, July 12, 2018, and informed him that he would need to go back onto Plaintiffs' farm. (S. M. Hopkins Depo. at 91:11–22).

**RESPONSE:**

35. Mr. Hopkins told him, "Well, do what you have to do," making no inquiry as to any warrant and voicing no refusal as to Detective Nichols entering Plaintiffs' farm. (S. M. Hopkins Depo. at 91:23–93:7).

**RESPONSE:**

36. Detective Nichols, with Dr. Johnson and Detective Michael Galyon, then visited Plaintiffs' farm and found the conditions to be similar to those on July 2, 2018, as there was still no sign of feed for the cattle, the forage in the fields still appeared to be inadequate and weed-infested, pinkeye was still present in the cattle, and older calves still appeared to be improperly weaned, though the dead cow had been removed from the creek. (Nichols Depo. at 95:12–97:6, 180:17–25; Johnson Depo. at 62:3–63:3).

**RESPONSE:**

37. During this visit, Detective Nichols and Dr. Johnson discovered two skeletal remains in a wooded portion of the pasture, as well as a sinkhole with the remains of multiple cattle that still had hide on them and were actively decomposing. (Nichols Depo. at 181:1–183:2; Johnson Depo. at 63:4–21; Nichols Decl., ¶ 7).

**RESPONSE:**

38. Dr. Johnson estimated that the cattle with hide on them had likely been dead for a month to six weeks and stated that this improper method of disposing of the carcasses could contaminate underground water sources, which could endanger the living cattle, other animals, and people. (Johnson Depo. at 63:22–65:21).

**RESPONSE:**

39. As she had previously done on July 2, 2018, Dr. Johnson completed a Livestock Welfare Examination Form on July 12, 2018, this time noting that the cattle, forty-nine (49) in total, did not have body condition scores indicative of reasonable health for their species, did not have access to appropriate forage/feed, did have major health/disease issues present in the form of pinkeye, were not receiving appropriate and timely care, and were not under veterinary care. (Nichols Depo. at Exhibit 10).

**RESPONSE:**

40. On these several bases, Dr. Johnson again determined that probable cause for animal cruelty was present, as the cattle "appear[ed] to be subject to . . . [u]nreasonable failure to provide livestock necessary food, water, care, or shelter." (Nichols Depo. at Exhibit 10).

**RESPONSE:**

41. The next morning, July 13, 2018, Detective Nichols, Detective Oliver, Detective Galyon, Detective Drew Binkley, Jason Williams of Marshall County Animal

Control, Phil Dunivan, Pete Blackwell, Tommy Wilson, and Bo Jackson and his minor son arrived at Plaintiffs' farm for the seizure of the cattle. (Nichols Depo. at 105:12–21).

**RESPONSE:**


42. Sheriff Lamb was also present at the scene of the seizure for a short period. (Nichols Depo. at 106:10–20; Deposition of William Lamb, 38:23–39:15; Declaration of Sheriff Lamb, ¶ 5).

**RESPONSE:**


43. Mr. Hopkins was present for a portion of the seizure and was informed by Detective Nichols that he would be arrested for animal cruelty the next week, but they arranged for Mr. Hopkins to surrender himself at a later date, as Mr. Hopkins was traveling for work that week. (S. M. Hopkins Depo. at 110:4–111:1; Nichols Depo. at 184:12–185:6).

**RESPONSE:**


44. Detective Nichols gave Mr. Hopkins the option of signing over the cattle to Marshall County so that he would not be charged for their care, but Mr. Hopkins declined. (S. M. Hopkins Depo. at 106:16–107:11).

**RESPONSE:**


45. Based upon Dr. Johnson's probable cause determination as to the entire herd, a total of forty-nine (49) heads of cattle were seized on July 13, 2018, as evidence of a crime and for the safety of the animals. (Nichols Depo. at 123:16–124:1, 139:11–140:12).

**RESPONSE:**

46. On July 19, 2018, Detective Nichols swore out forty-nine (49) arrest warrants stating that Mr. Hopkins had violated Tenn. Code Ann. § 39-14-202 Cruelty to Animals. (Nichols Depo. at 163:25–164:6; First Am. Compl., D.E. 28, PageID # 257–305).

**RESPONSE:**

47. After the seizure on July 13, 2018, two cows and two calves remained on Plaintiffs' farm because they were too wild to be captured the first time. (Nichols Depo. at 161:21 – 162:10, 168:20–169:1).

**RESPONSE:**

48. Because Mr. Hopkins had refused consent for entry to his farm property to gather the remaining cattle, Detective Nichols obtained search warrants on July 31, 2018, and August 1, 2018, for the cattle and successfully seized the four remaining cattle on August 1, 2018, and August 2, 2018. (Nichols Depo. at 124:6–19, Exhibit 10; First Am. Compl. ¶¶ 56–57, Exhibit 3 and Exhibit 4, D.E. 28).

**RESPONSE:**

49. Mr. Jackson received and cared for all the cattle, as he had made a financial arrangement with the County to be paid five dollars per head of cattle per day in addition

to a ten dollar chute fee per head for the intake and processing of the cattle. (Jackson Depo. at 20:3–13, 24:21–25:12; Nichols Decl., ¶ 9).

**RESPONSE:**


50. On the morning of July 14, 2018, Mr. Jackson and Detective Nichols began tagging the cattle, and though Mr. Jackson had other cattle on his property, the cattle seized from Plaintiffs' farm were kept separately. (Nichols Depo. at 161:4–20; Jackson Depo. at 18:2–4).

**RESPONSE:**


51. Mr. Jackson has extensive education and experience in agriculture and livestock, and he identified numerous issues with the cattle seized from Plaintiffs. (Jackson Depo. at 9:5–10:5).

**RESPONSE:**


52. Specifically, Mr. Jackson observed that the larger "older herd was wild" and appeared to have been "taking care of themselves for maybe several years," though the two herds were combined as one during the seizure. (Jackson Depo. at 13:11–16, 16:25–17:19).

**RESPONSE:**


53. Mr. Jackson also noted issues with inbreeding, malnourishment, and improper nursing, weaning, and reproduction. (Jackson Depo. at 31:5–32:1, 35:13–36:3, 48:7–54:14).

**RESPONSE:**

54. When he received the cattle, he estimated that ten to fifteen percent "looked like their lives were on the line." (Jackson Depo. at 13:4–6).

**RESPONSE:**

55. To Mr. Jackson's pleasant surprise, only four of the cattle seized from Plaintiffs died in his care, though the one calf that was born in his care also died. (Jackson Depo. at 29:7–21, 34:12–16).

**RESPONSE:**

56. Mr. Jackson attributed this calf's death to the presence of a bigger calf nursing all the colostrum out of the mother cow, and though he bottle-fed the calf, it still perished. (Jackson Depo. at 34:12–35:4).

**RESPONSE:**

57. While the cattle were under Mr. Jackson's care, Dr. Johnson conducted a herd check on September 4, 2018, and recorded the tag number, description, weight, pinkeye status, and body condition score of each of the forty-nine (49) that were present at the time. (Johnson Depo. at 12:14 – 15:22; Nichols Depo. at Exhibit 10).

**RESPONSE:**

58. On October 25, 2018, Dr. Johnson conducted a second herd check at Mr. Jackson's farm to see if the cattle were improving, but this check was more general, as Dr. Johnson examined the herd as a whole. (Johnson Depo. at 16:16–17:6).

**RESPONSE:**

59. Dr. Johnson was pleased with the improvement she saw in these herd checks, as the body condition score of the herd as a whole improved approximately from a three to a six. (Johnson Depo. at 65:22–66:16).

**RESPONSE:**

60. While the criminal proceedings were pending against Mr. Hopkins, the cattle were sold due to the costs of upkeep on December 17, 2018, and the criminal cases were dismissed on the condition that Mr. Hopkins pay for the care of the cattle from the proceeds of their sale. (First Am. Compl. ¶¶ 60–61, D.E. 28; S. M. Hopkins Depo. at Exhibit 1).

**RESPONSE:**

61. Marshall County paid the remaining amount, as the sale of the cattle did not cover the entire cost. (First Am. Compl. at ¶ 61, D.E. 28).

**RESPONSE:**

Respectfully submitted,

*/s/ Robyn Beale Williams*
Robyn Beale Williams, BPR #19736
Destin T. Tisher, BPR # 36962
FARRAR & BATES, LLP
211 Seventh Avenue North, Suite 500
Nashville, Tennessee 37219
Phone: (615) 254-3060
Fax: (615) 254-9835
robyn.williams@farrar-bates.com
destin.tisher@farrar-bates.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 28th day of October, 2020, a true and correct copy of the foregoing has been forwarded via the U.S. District Court's electronic filing system to:

Frank R. Brazil, BPR #24586
Wesley Clark, BPR #32611
**BRAZIL CLARK, PLLC**
2706 Larmon Avenue
Nashville, TN 37204
Phone: 615-730-8619
Fax: 615-514-9674
wesley@brazilclark.com
frank@brazilclark.com
*Counsel for Plaintiffs*

*/s/ Robyn Beale Williams*
Robyn B. Williams