**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT COLUMBIA**

| | | |
|---|---|---|
| **STEPHEN MATTHEW HOPKINS** and | ) | |
| **JULIE R. HOPKINS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:19-cv-00059** |
| | ) | |
| **ANTHONY "TONY" NICHOLS,** *in his* | ) | **District Judge Campbell/** |
| *individual and official capacity,* | ) | **Magistrate Judge Holmes** |
| **SHERIFF WILLIAM "BILLY" LAMB,** | ) | |
| *in his individual and official capacity***;** | ) | **JURY DEMAND** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

COME NOW the Plaintiffs, by counsel, and in response to the Defendant's <u>Motion for Summary Judgment</u> (ECF 38), would show as follows:

### I.     PRELIMINARY STATEMENT AND ADDITIONAL MATERIAL FACTS

In seeking summary judgment, the Defendants are requesting this court to hold that gun-wielding government agents may coercively summon a man's wife from his home, come and go from their property at will over an eleven-day period without consent or judicial approval, issuing commands backed by threat of arrest, before returning on the eleventh day with a posse to seize tens of thousands of dollars in property without ever obtaining a warrant, providing a meaningful opportunity to be heard following the seizure, or providing just compensation.  For the reasons herein, the <u>Motion</u> should be denied.

Plaintiffs Stephen Matthew Hopkins and Julie R. Hopkins filed the present action against Defendants Anthony "Tony" Nichols, Sheriff William "Billy" Lamb, and Marshall County (as the "official capacity" municipal defendant), and Jared "Bo' Jackson on July 14, 2019. (Complaint, Doc. 1, p. 1). On March 30, 2020, the Plaintiffs filed the First Amended Complaint, which remains the operative pleading, (First Amended Complaint, Doc. 28) against Defendants Nichols and Lamb, both individually and in their official capacities. (Id.) Plaintiffs allege violations of their rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, specifically alleging Defendants' violated their rights to Procedural Due Process, committed unlawful searches and seizures, and violated their rights under the Taking's Clause, all pursuant to 42 U.S.C. § 1983 (*Id.*, ¶ 66-106). The Defendants filed an Answer to the First Amended Complaint, denying all the claims against them. (Answer to First Amended Complaint, Doc. 34, ¶ 66-106).

In addition to the facts which the Plaintiffs do not dispute and those further asserted in their Response to Defendant's Statement of Undisputed Material Facts, the following facts are necessary for consideration in adjudicating the Defendants' motion. On July 2, 2018, Nichols appeared at the back door to the Hopkins' residence with Dr. Johnson, wearing his badge and gun (Deposition of Tony Nichols, "Nichols Depo.", 126:25-127:8) and demanded that Mrs. Hopkins escort them to the dead cow on her property. (Deposition of Julie Hopkins, "J. Hopkins Depo.", 39:17-41:21). Mrs. Hopkins twice asked to delay compliance with Nichols' demand, and Nichols responded "No, absolutely not. I need to see them right now." (Id.) The call placed by Mrs. Hopkins to Mr. Hopkins during this encounter while Nichols stood at the door was recorded. (Id., Ex. 2 – 7.2.18 Initial Encounter Audio Recording) On this call, Mrs. Hopkins tells her husband, within earshot of Nichols, that she had to comply with Nichols' demand "right

now" and that she was just calling him to let him know what was going on. (Id.) Mrs. Hopkins was scared when this happened and did not feel like she had any choice. (Declaration of Julie Hopkins, "J. Hopkins Dec." ¶4). Many of the cattle were healthy, particularly the smaller herd. (Nichols Depo., 70:15-18, 166:24 - 167:5; Deposition of Jill Johnson, "Johnson Depo.", 39:18-40:2, 10:18-21; Deposition of Jerry Jackson, "Jackson Depo.", 30:24-31:4; Declaration of Matthew Hopkins, "Hopkins Dec.", ¶23 ).

Detective Nichols testified under oath that Plaintiff Matthew Hopkins spoke with Nichols during the July 2, 2018, encounter at the Hopkins' residence. (Nichols Depo., 130:6 - 144:25). All parties agree that Mrs. Hopkins called her husband, who was not home, while Nichols was at the door. (Doc. 41, ¶ 8). Nichols testified that while he was standing on the back porch, during the call from Mrs. Hopkins, that Mr. Hopkins provided consent directly to Nichols (Nichols Depo., 144:2-25). However, Mr. Hopkins never spoke directly with Nichols during this call. (Exhibit 2 – Initial Encounter Audio Recording; M. Hopkins Dec., ¶13).

When Nichols returned to the Plaintiffs' farm on July 9, 2018, Mrs. Hopkins emerged from a building on the farm and told Nichols that her husband would be there soon. (Nichols Depo. at 83:2–25; J. Hopkins Depo. at 74:2–9). Mr. Hopkins arrived, and he told Nichols that he did not appreciate him coming onto the property without permission and driving around. (Nichols Depo. at 85:6–86:6; Deposition of Stephen Matthew Hopkins, "M. Hopkins Depo.," 81:17–82:16). Nichols told Mr. Hopkins that he better watch how he talked or Nichols would arrest him, as this was an ongoing investigation and Nichols can come onto the property anytime he wants. (M. Hopkins Depo., 81:8-16). Mr. Hopkins had three healthy cattle in the catch area of his farm and told Nichols he intended to take them to the sale barn. (Hopkins Dec., ¶15). Nichols then ordered Mr. Hopkins not to remove any of the cattle from his property at this time

or he would be arrested. (M. Hopkins Depo., 82:1-15). Mr. Hopkins then released the healthy

cattle from the catch area. (M. Hopkins Depo., 81:6-87:18; Hopkins Dec., ¶15). They discussed

the cattle further, and Nichols did not express any concern about Mr. Hopkins providing feed or

care for the cattle on July 9, 2018. (Id., Hopkins Dec., ¶17). Eventually, Nichols agreed that Mr.

Hopkins could sell the large herd and keep the small herd. (M. Hopkins Depo., 87:1-25) Mr.

Hopkins asked if he still needed to have the veterinarian come out, since he was going to sell the

large herd before the veterinarian was scheduled, and Nichols told him no. (M. Hopkins Depo.,

85:1-18) During this encounter, Nichols gave Mr. Hopkins the number of an auctioneer that may

be able to refer Mr. Hopkins to some people that could help him haul larger numbers of cattle at

a time. (M. Hopkins Depo., 84:10-17; 87:19-21). Nichols considered his repeated incursions onto

the Hopkins' farm from July 2 through July 13 justified as an "ongoing investigation." (Nichols

Depo. 90:16-25; Hopkins Dec., ¶22).

　　　　Nichols called Mr. Hopkins on July 12 and told him that he was coming onto the farm

and that he just wanted to let Mr. Hopkins know so he "didn't scare" his wife this time. (M.

Hopkins Depo., 91:15-24). Mr. Hopkins said "well do what you have to do," meaning "follow

the law," as Nichols had asserted lawful authority to enter the property whenever he liked and

threatened to arrest Mr. Hopkins when he told Nichols not to come back without express

permission. (M. Hopkins Depo., 81:8-16).

　　　　On July 9, 2018, when Nichols came to the farm, Mr. Hopkins showed him where hay

and grain feeders were available to the cattle, as they had been since Nichols' first entry on July

2. (Hopkins Dec., ¶7; Exhibit 8 – Photographs of grain/hay). Adequate water supply existed

(Hopkins Dec., ¶8; Ex. 1 – Water Photos), Mr. Hopkins called a veterinarian, and the dead cow

had been removed. (Hopkins Dec., ¶21). Nichols and Dr. Johnson did not inspect the entire farm,

which included a pond at the back of the property providing an "adequate" water supply to one of the herds. (Johnson Depo., 58:19-60:22). Dr. Johnson could not accurately tell how long ago the cattle found in the sinkhole or laying on the farm had died. (Johnson Depo., 63:4-64:14) Body Condition Scores of four to six are ideal or optimal. (Johnson Depo., 58:12-17). When Dr. Johnson scored the cattle on July 2, 2018, a number of cattle on the Hopkins' farm, particularly in the small herd, were scored the ideal or optimal range. (Exhibit 6 – 7.2.18 BCS Chart) Pinkeye was the only "major health/disease issue" identified on either the July 2 or July 12 Livestock Welfare Examination Form completed by Dr. Johnson. (Id., Exhibit 7 - 7.12.18 Livestock Welfare Exam Form).

Between July 2, 2018, and July 12, 2018, Mr. Hopkins had complied with Nichols' demand regarding the dead cow in the creek (Nichols Depo., 84:1-25). Nichols saw the grain in a cattle feeder for one herd and hay for the other herd when he was at the farm on July 9, 2018. (Hopkins Dec., ¶7; Exhibit 8 – Photographs of grain/hay), and Nichols testified during the preliminary hearing of the criminal charges against Mr. Hopkins that he saw where Mr. Hopkins was pouring grain out for the cattle. (Hopkins Dec., ¶18; Nichols Depo., Ex. 13, p. 22). Dr. Johnson testified that, even excluding the creek where a deceased cow was found on July 2, ponds and a water trough on the farm provided adequate water supply to the two herds. (Johnson Depo., 59:20-60:10). On both July 2, 2018, and July 12, 2018, the Livestock Welfare Examination Form completed by Dr. Johnson failed to include individual body condition scores as an attachment, as required by the form relied upon by Nichols. (Exhibit 4 - 7.2.18 Livestock Welfare Exam Form, 6 - 7.2.18 Animal Identification BCS Chart, 7 - 7.12.18 Livestock Welfare Exam Form). Both the July 2 and July 12 Livestock Welfare Examination forms indicate an "unreasonable failure to provide necessary food, water, care or shelter.'" *Id.* No allegation was

made that Mr. Hopkins failed to provide shelter, and the only alleged failure to provide care was based on pinkeye. *Id.*

Nichols made no attempt to secure a court order for the seizure. (Nichols Depo, 147:17-20). Nichols does not claim that any exigent circumstance existed when he seized the cattle on July 13. (Nichols Depo., 189:3-7). The process to obtain a warrant in Marshall County may take "two or three hours," and Nichols never encountered problems with reaching a judge for the purposes of obtaining a warrant. (Nichols Depo. 46:19-49:3).

Even according to the Defendants and Dr. Johnson, a number of the cattle were undisputedly in good health (Nichols Depo., 70:15-18, 166:24 - 167:5; Johnson Depo. 39:18-40:2, 10:18-21; Jackson 30:24-31:4; M. Hopkins Dec., ¶23).

On the day the Defendants seized the cattle on July 13, the cattle were not individually photographed, none were tagged, and the two herds were mixed together. (Jackson Depo., 13:11-25; Nichols 160:23-161:25). Sometime after the seizure, Nichols took "several photographs, but not one of each cow." (Nichols Depo., 160:23-161:11)

Following the seizure, and despite their efforts to do so, the Plaintiffs were not permitted to inspect their cattle for over three months. (Nichols Depo., 162:19-163:24; Hopkins Dec., ¶27).

Nichols made an oral agreement with Jerry "Bo" Jackson for holding the Hopkins' cattle at a cost of five dollars per day, per head. (Jackson Depo., 20:6-25; 22:1-15)

Other subjects of Nichols' livestock seizures had voluntarily surrendered their animals to Marshall County at the time Nichols seized the animals (Nichols Depo., 115:18-116:15) When Marshall County seizes livestock, it sells them and may anticipate making a profit on the transaction if the livestock are not held for an extended period of time. (30(b)(6) Deposition of William Lamb ("Lamb 30(b)(6) Depo."), 16:19-17:11). Nichols told Jackson that he would not

be paid until the case "settled," and he expected this to occur within 30 to 45 days. (Jackson Depo., 21:1-12). Because of the length of time the Hopkins' cattle were held, the County did not make a profit on the cattle. (Lamb 30(b)(6) Depo., 16:19-17:11).

Lamb has been the elected Sheriff of Marshall County since 2014 and is responsible for determining policy governing animal seizures. (Lamb Depo, 8:19-23; 54:20-22; 58:19-23). Lamb had prior knowledge that the July 13 seizure was occurring and he participated in the July 13 seizure. (Lamb Depo., 25:10-19; 26:1-15; 39:19-25). The County claims that it had no "official policy" governing the seizure of livestock. (Lamb 30(b)(6) Depo., 18:5-25). The County produced records from all animal cruelty investigations and related animal seizures occurring between 2011 and July 13, 2018, and Nichols was the investigating officer for all of them. (*Id.* at 10:3-25). In all of these cases, Nichols entered the owner's property and seized the animals, and some of the owners immediately relinquished ownership of the animals to Marshall County. (Nichols Depo., 111:19-119:12). Nichols never obtained a warrant prior to entering properties or seizing these animals. (Nichols Depo, 147:17-20). The Sheriff agreed that what Nichols did in these animal cruelty investigations is equivalent to what the Marshall County Sheriff's Department does in these investigations. (Lamb Depo., 58:6-12) Lamb is responsible for Nichols and the manner in which Nichols conducts livestock investigations and seizures. (Id., 57:17-58:5). The County agreed that the manner in which Nichols conducted these investigations and seizures is the custom of the Marshall County Sheriff's Office. (Lamb 30(b)(6) Depo. at 12:22-13:2).

## II.    LAW AND ARGUMENT

### A.  STANDARD OF REVIEW

Rule 56(a) provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]" Fed. R. Civ. P. 56(c)(1). This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer,* 536 U.S. 730, 739 (2002). "[T]he salient question ... is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741. "The fact that the law may have been unclear, or even hotly disputed, at the margins does not afford state actors immunity from suit where their actions violate the heartland of the constitutional guarantee, as that guarantee was

understood at the time of the violation." *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir.

1997).  Consequently, "officials can still be on notice that their conduct violates clearly

established law even in novel factual circumstances….Although earlier cases involving

'fundamentally similar' facts can provide especially strong support for a conclusion that the law

is clearly established, they are not necessary for such a finding."  *Hope v Pelzer,* 536 U.S. 730,

741 (2002); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004).  Where the

legal question of qualified immunity turns upon which version of the facts one accepts, the jury,

not the judge, must determine liability. *Id.* at 900 (citations omitted).


   **B.  The Defendants' conduct violated the Plaintiffs' clearly established rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments, and neither Nichols nor Lamb are entitled to qualified immunity.**


   Relevant to each argument below are the facts that William "Billy" Lamb has been the

elected Sheriff of Marshall County since 2014 and is responsible for determining policy

governing animal seizures. (Lamb Depo, 8:19-23; 54:20-22; 58:19-23). Lamb is responsible for

Nichols and the manner in which Nichols conducts livestock investigations and seizures. (Lamb

Depo., 57:17-58:5). Lamb participated in the July 13 seizure; he had prior knowledge that his

agents were "going to pick the livestock up" on July 13; and he participated in at least one

previous livestock seizure conducted by Nichols. (Lamb Depo., 25:15-19; 26:1-15; 39:19-25).


   1.  **The Defendants violated Plaintiffs' clearly established Fourteenth Amendment right to Procedural Due Process.**

   The Fourteenth Amendment protects an individual from deprivation of life, liberty or

property without due process of law. *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).

An essential principle of due process is that a deprivation of life, liberty, or property be preceded

by notice and opportunity for hearing appropriate to the nature of the case. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal citations omitted). The Due Process Clause requires provision of this hearing at a meaningful time and a meaningful manner before being deprived of a protected property interest. *Id.* at 533–34; *McCormick & Assocs., Inc. v. City of Detroit*, 61 F. App'x 953, 955 (6th Cir. 2003).

The Tennessee Supreme Court held that procedural due process prohibits the forfeiture of private property absent strict compliance with Tennessee's statutory forfeiture procedures. *State v. Sprunger*, 458 S.W.3d 482, 493 (Tenn. 2015). The State's "exercise of police powers" in effecting the forfeiture of private property "requires black letter compliance to procedural rules intended to safeguard the due process rights of citizens." *Redd v. Tennessee Dep't of Safety*, 895 S.W.2d 332, 335 (Tenn. 1995). "[I]n forfeiture proceedings, the governmental authority seeking forfeiture must present affirmative proof that it has complied with both the procedural and the substantive requirements in the forfeiture statutes enacted by our Legislature. *Sprunger*, 458 S.W.3d at 499–500.

Tennessee's courts have found that the procedures set forth in T.C.A. § 39-11-701 *et seq*, apply to seizures under T.C.A. § 39-14-202 based on animal cruelty charges. *In re Tennessee Walking Horse Forfeiture Litig.* 2017 WL 3836021, at 8; fn. 7 (Tenn. Ct. App. Aug. 31, 2017). The procedure requires that an officer making the seizure apply for a forfeiture warrant by filing a sworn affidavit within five (5) working days following the seizure. *Id.* at 11. The opinion in *Walking Horse* is particularly informative regarding to the Hopkins' Procedural Due Process claim.

In *Walking Horse*, officials from the Fayette County Sheriff's Department and the US Department of Agriculture seized two Tennessee Walking Horses incident to the arrests of the

horses' trainers for animal cruelty on March 1, 2012. *Id.* at 1. The officials placed the horses into the custody of the Humane Society. *Id.* The horse owners pleaded guilty in the U.S. District Court for the Eastern District of Tennessee to soring the horses at issue in violation of the Federal Horse Protection Act. *Id.* The trainers also pleaded guilty to State animal cruelty charges, and the trainers admitted, as part of their state-court pleas, to having sored and abused the two horses. *Id.*

On July 10, 2013, the State filed an *ex parte* application for a forfeiture warrant for the horses, and the Fayette County Circuit Court issued an ex parte Forfeiture Warrant and Order. *Id.* The owners later sued and argued that the forfeiture warrant was not properly issued because the state failed to obtain it within five (5) working days of March 1, 2012, as required by Tenn. Code. Ann. § 39-11-707(c). *Id.* The trial court found for the owners, and the State appealed on two issues, including whether the lower court erred in granting the owners' motion for summary judgment due to the State's failure to comply with applicable procedural requirements. *Id.* at 2. The state contended, *inter alia,* that Tenn. Code Ann. § 39-11-701 *et seq* was not applicable to the seizure of the horses. *Id.* at 11.

The *Walking Horse* court noted that the strict procedural requirements contained in the general forfeiture statutes T.C.A. § 39-11-701 *et seq.,* were applicable to the horse seizures. "We recognize that animals forfeited under the animal cruelty statutes are not property acquired or received as a result of the offense, but absent any forfeiture procedures within Part 2 on Animals, we look to the general provisions of this title for the proper procedure" *Id.* at 3. "Even if we were to assume, however, that the horses were subject to forfeiture in this case, the undisputed facts establish that the State failed to strictly comply with the procedural requirements of the general forfeiture statutes. Here, the undisputed facts show that the horses were seized on March 1, 2012.

At that time, certain procedural safeguards were triggered," specifically including the five-day warrant application requirement. *Id.* at 11. The court concluded that nothing in the general forfeiture statutes suggested that the requirement for timely procurement of a forfeiture warrant is excused while criminal proceedings were ongoing, and that the forfeiture was not appropriate based on the failure to strictly comply with statutorily mandated procedures. *Id*. at 12.

The *Walking Horse* defendants also raised a broader and more plausible version of the same argument asserted here by Lamb and Nichols – that Title 39, Chapter 14, permits confiscation of livestock and, therefore, their failure to strictly adhere to the procedural requirements of T.C.A. § 39-11-701 is immaterial. Id. at 8. The court stated: "Respectfully, we cannot agree that sections 39–14–202 and 39–14–210 provide support for the forfeiture of the animals in this case. As noted above, section 39–14–202 expressly states that forfeiture under that subsection is applicable 'in addition to' a criminal penalty for 'the person convicted,' and that the surrender and forfeiture should be carried out by 'the court making the sentencing determination[.]'" *Id.* at 8. Here, the Defendants specifically cite to T.C.A. § 39-14-211 as independently authorizing a seizure. T.C.A. § 39-14-211 reads in pertinent part: "**No** [ ... ] confiscation or any other action authorized by this part or any other law shall be taken **unless** [ ... ]," (emphasis added). Just as the Bill of Rights expressly states what the government may not do, as opposed to what it must do, T.C.A. § 39-14-211 places additional limits on government authority to seize livestock beyond those contained in "this part or any other law."

The *Walking Horse* facts and rationale are directly on point with the instant case. Like the *Walking Horse* plaintiffs, Mr. and Mrs. Hopkins' cattle were seized by those acting under color of law; they were arrested and charged with animal cruelty; the animals seized were alleged to have been victims of animal cruelty by the animals' owners; horses with sored hooves

are analogous to cows with very poor body scores; and the government did not comply with the strict procedural requirements of T.C.A. § 39-11-707(c). Like the *Walking Horse* plaintiffs, the Hopkins possessed a property interest in their livestock. The Defendants deprived them of this property when they seized the forty-nine cattle on July 13, 2018, and there was no process whatsoever provided to the Hopkins prior to or at a meaningful time after depriving them of their property. As a result, the Plaintiffs suffered prejudice because they were unable to even inspect their cattle for over three months, while over twenty-thousand dollars of upkeep costs were incurred. (Nichols Depo., 162:19-163:24; Jackson Depo., 20:6-25; 22:1-15; Hopkins Dec., ¶28; Jackson Depo., 21:1-12).

The Defendants claim exception from the forfeiture statute based on retaining the property for evidence in a criminal proceeding, and assert that no forfeiture occurred. Forfeiture is defined as " '[t]he divestiture of property without compensation." *State v. Sprunger*, 458 S.W.3d 482, 492 (Tenn. 2015) (quoting Black's Law Dictionary 722 (9th ed. 2009)). This divestiture is precisely what the Defendants inflicted upon the Hopkins in seizing their two herds of cattle.

It is impossible (or at the very least, implausible and impracticable) to corral the physical bodies of forty-nine cattle into court as evidence. On the day the Defendants seized the cattle on July 13, the cattle were not individually photographed, none were tagged, and the two herds were mixed together. (Jackson Depo., 13:11-25; Nichols 160:23-161:11). Indeed, Nichols only ever bothered to take "several photographs, but not one of each cow" (Nichols Depo., 160:23-161:3), presumably collecting what the Defendants actually considered to be evidence. Even if seizing large animals was necessary or justified as a seizure of evidence, a number of the cattle were undisputedly in good health and could not, as a result, be evidence of a crime. (Nichols Depo.,

70:15-18, 166:24 - 167:5; Johnson Depo. 39:18-40:2, 10:18-21; Jackson 30:24-31:4; Hopkins Dec., ¶23).

Nichols' and Lamb's actions violate the core protection guaranteed by the right to procedural due process - provision of a hearing at a meaningful time and a meaningful manner before being deprived of a protected property interest. The Plaintiffs were not even allowed to inspect the cattle for over three months (Nichols Depo., 162:19-163:24; Hopkins Dec., ¶27) and they were being charged five dollars per day, per head. (Jackson Depo., 20:6-25; 22:1-15). At this rate, by the time the Hopkins were allowed to even inspect the cattle, the County had incurred over twenty-thousand dollars in costs for their upkeep. (Nichols Depo., 162:19-163:24; Hopkins Dec., ¶28). Therefore, neither are entitled to qualified immunity.

    2.  **Defendants violated the Plaintiffs' right to be free from unreasonable searches and seizures in violation of the Fourth Amendment.**

Nichols conducted warrantless searches and seizures between July 2 and July 13 on the Hopkins' farm. Considering this in conjunction with his July 9 statement to Mr. Hopkins that because "this is an ongoing investigation," he could come onto the Hopkins' property "whenever he wanted" (M. Hopkins Depo., 92:3-22; *see also* Nichols Depo. 90:16-25), Nichols considered the duration of the search and seizure to span the entire period from July 2 to July 13. He forbade Mr. Hopkins from taking several healthy cattle from the farm and ordered him to release them from the catch area on July 9. (M. Hopkins Depo., 81:6-87:18; Hopkins Dec., ¶15). For the reasons set forth below, this "open investigation" constituted an unreasonably broad search of unreasonable duration, and the seizures (ultimately culminating in removal of the cattle on July 13) were unreasonable in violation of the Hopkins' federally protected constitutional rights.

        a.  **Julie Hopkins was seized on July 2, and Nichols' search of the property constituted an unlawful search**

The Fourth Amendment to the United States Constitution protects individuals from "unreasonable searches and seizures of "their persons, houses, papers, and effects." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62 (1992). Under the Fourth Amendment, there are three types of permissible encounters between police officers and citizens: "consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion[';] and arrests which must be based on probable cause." *Aquino v. Honda of Am., Inc.*, 158 Fed.App'x. 667, 672 (6th Cir.2005) (per curiam). The Sixth Circuit has held that "summoning a person out of his or home" cannot be characterized as an investigative stop. *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001). Summoning a person from their home with a show of force or authority constitutes constructive entry and in-home arrest, rather than an investigatory stop. *Id.* Warrantless seizures of persons inside their homes violate the Fourth Amendment, absent exigent circumstances. *Id.*

A person is "seized" when, "by means of physical force or a show of authority, his freedom of movement is restrained." This occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

In *Mendenhall,* the court analyzed whether two federal agents seized Ms. Mendenhall when they approached her, asked for identification and a ticket, and posed a few questions. In

determining that no seizure occurred, the *Mendenhall* court noted the government agents' lack of uniforms, lack of weapons, and the fact that the encounter occurred in a "public concourse." *Id.* at 555. Based on these factors, the *Mendenhall* court found that there was no objective reason for Ms. Mendenhall to believe she was not free to leave and end the conversation. *Id.*

Applying the *Mendenhall* analysis to the instant case, Mrs. Hopkins was clearly seized on July 2, 2018. Nichols appeared at her back door with Dr. Johnson, wearing his badge and gun, and demanded that she escort him to the cattle on her property. (J. Hopkins Depo, 39:17-41:21; Nichols Depo. 126:25-127:8; J. Hopkins Dec. ¶¶3-4). Mrs. Hopkins twice asked to delay compliance with Nichols' demand, and Nichols responded "No, absolutely not. I need to see them right now." *Id.* The call placed by Mrs. Hopkins to Mr. Hopkins while Nichols stood at the door was recorded. (*Id.;* Ex. 2 – 7.2.18 Initial Encounter Audio Recording). On this call, Mrs. Hopkins tells her husband, within earshot of Nichols, that she had to comply with Nichols' demand "right now" and that she was just calling him to let him know what was going on. *Id.* Mrs. Hopkins was scared when this happened, and did not feel like she had any choice but compliance. (J. Hopkins Depo., ¶6)

The Defendants claim that voluntary consent by Mrs. Hopkins on July 2, 2018, provided an exception to the Fourth Amendment's warrant requirement. (Doc. 39, PageID#360). Where consent is so relied upon, the State has the burden of proving that necessary consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973). Consent is not voluntary if it "was coerced by threats or force, or granted only in submission to a claim of lawful authority," and such coercion renders consent invalid and searches unreasonable. *Id.* at 234.. Mrs. Hopkins merely submitted to Nichols' claim of lawful authority when he identified himself as an officer, while wearing a badge and gun, and demanded that she take him to the

cattle "right now." Because there was no voluntary consent, no warrant, and no exigent circumstances, the seizure of Julie Hopkins on July 2, 2018, was unlawful.

The Defendants' reliance upon the "open fields" doctrine to support Nichols' actions on July 2, 2018, citing *Holloran v. Duncan*, 92 F. Supp. 3d 774, 790 (W.D. Tenn. 2015), is likewise misplaced. The doctrine permits only visual inspections (as opposed to seizures) of property, and therefore it may not be relied upon by the Defendants to justify either the seizure of Mrs. Hopkins or the later warrantless seizure of the Plaintiffs' cattle. *See Allinder v. Ohio*, 808 F.2d 1180, 1185 (6th Cir.1987) ("[T]he Supreme Court has consistently adhered to the open fields doctrine while at the same time recognizing that it is limited in scope to 'sights seen in "the open fields" '."); *Husband v. Bryan*, 946 F.2d 27, 29 (5th Cir.1991) ("Neither this court nor the Supreme Court have extended the open fields doctrine to anything beyond observation searches."). "Thus, in typical open fields cases where police officers have spied evidence of the manufacture or possession of illegal drugs, those officers usually have obtained a warrant before actually seizing the evidence." *United States v. Rapanos,* 115 F.3d 367, 373 (6th Cir. 1997) *citing*, *Oliver v. United States*, 466 U.S. 170, 174 (1984); *United States v. Dunn*, 480 U.S. 294, 298, (1987). *Rapanos*, 115 F.3d at 373–74 (6th Cir. 1997).

> **b. Between the initial encounter on July 2 and the ultimate seizure on July 13, Defendants committed further unlawful searches and seizures as part of Nichols' "ongoing investigation"**

A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property. *Soldal v. Cook Cty., Ill.*, 506 U.S. 56 (1992). A seizure may, by its manner of execution, unreasonably infringe possessory interests protected by the Fourth Amendment's prohibition on "unreasonable seizures." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). "Such an inquiry does not require a determination of whether there was in

fact a need for the [defendants] to [seize the property]; instead we are required to determine whether the [defendants'] decision to [seize the property] was reasonable under the circumstances." *Collins v. Nagle*, 892 F.2d 489, 493 (6th Cir.1989).

When Nichols returned to the Plaintiffs' property on July 9, 2018, Mrs. Hopkins emerged from a building and told Nichols that her husband would be there soon. (Nichols Depo. at 83:2–25; J. Hopkins Depo. at 74:2–9). Mr. Hopkins arrived, and he told Nichols that he did not appreciate him coming onto the property without permission and driving around. (Nichols Depo. at 85:6–86:6; S. M. Hopkins Depo., 81:17–82:16). Nichols told Mr. Hopkins that he better watch how he talked or Nichols would arrest him, as this was an ongoing investigation and Nichols can come onto the property anytime he wants. (M. Hopkins Depo., 81:8-16). Mr. Hopkins had three healthy cattle in the catch area of his farm and told Nichols he intended to take them to the sale barn. (Hopkins Dec., ¶15). Nichols then ordered Mr. Hopkins not to remove any of the cattle from his property or he would be arrested. (M. Hopkins Depo., 82:1-15). Mr. Hopkins then released the healthy cattle from the catch area. (Hopkins Dec., ¶15). They discussed the cattle further, and Nichols did not express any concern about Mr. Hopkins providing feed or care for the cattle on July 9, 2018. (M. Hopkins Depo., 82:1-15; Hopkins Dec., ¶17). Eventually, Nichols agreed that Mr. Hopkins could sell the large herd and keep the small herd. (M. Hopkins Depo., 87:1-25). Mr. Hopkins asked if he still needed to have the veterinarian come out, since he was going to sell the large herd before the veterinarian was scheduled, and Nichols told him no. (M. Hopkins Depo., 85:1-18) During this encounter, Nichols gave Mr. Hopkins the number of an auctioneer that may be able to refer Mr. Hopkins to some people that could help him haul larger numbers of cattle at a time. (M. Hopkins Depo., 84:10-17; 87:19-21).

When Nichols ordered Mr. Hopkins not to remove any cattle from the property and required Mr. Hopkins to release the three healthy cattle from the catch area, he meaningfully interfered with Mr. Hopkins' possessory interests in the cattle, ensuring the cattle's availability for the July 13 raid, thus effecting a seizure of all the cattle on the property. This seizure was conducted without a warrant, in absence of voluntary consent (based on the threats and intimidation by Nichols), and without exigent circumstances. Seizing all the cattle, especially the healthy cattle, under the totality of circumstances was objectively unreasonable. Therefore, the seizure was unlawful and in violation of the Fourth Amendment. It is a reasonable inference from the evidence that Nichols' orders precluding the immediate removal of the cattle was a ploy, designed to ensure the cattle's availability for the raid on July 13.

When Nichols called Mr. Hopkins on July 12, he told Mr. Hopkins that he was coming onto the farm and that he just wanted to let Mr. Hopkins so he "didn't scare" his wife this time. (M. Hopkins Depo., 91:15-24). Mr. Hopkins said "well do what you have to do," meaning "follow the law," as Nichols had asserted lawful authority to enter the property whenever he liked and threatened to arrest Mr. Hopkins when he told Nichols not to come back without express permission. (M. Hopkins Depo., 81:8-16). Even if Nichols interpreted Mr. Hopkins' statement as consent, it was not voluntary, as any acquiescence to Nichols was based on his prior show of force, threats to arrest, and claim of lawful authority. Therefore, the Defendants may not rely on Mr. Hopkins statement "well do what you have to do" as providing consent for the July 13 raid.

      **c.** **The warrantless entry onto the Hopkins' farm and seizure of cattle on July 13 constituted a continuation of the unreasonable search of the property and was an unreasonable seizure of the Plaintiff's cattle.**

The Defendants again claim that all the warrantless seizures on July 13, 2018, were justified because the Defendants had probable cause to believe the cattle were "evidence of a crime." However, many of the cattle were healthy, particularly the smaller herd. (Nichols Depo., 70:15-18, 166:24 - 167:5; Johnson Depo. 39:18-40:2, 10:18-21; Jackson Depo., 30:24-31:4; Hopkins Dec., ¶23).   Seizing the animals themselves as evidence of animal cruelty is not justifiable as set forth *supra,* §B. (1), and the seizure of healthy cattle is especially unjustifiable. On July 13, the cattle were not individually photographed, none were tagged, and the two herds were mixed together (Jackson Depo., 13:11-25;  Nichols Depo. 160:23-161:11) rendering it impossible to tell precisely which cattle belonged to which herd. This manner of seizure is objectively unreasonable.

Next, there is additional and explicit precedent from the Sixth Circuit and elsewhere establishing a duty for Nichols to consider readily available exculpatory evidence, including Mr. Hopkins' compliance with his commands to address Nichols' perceived problems on the farm.  It is true that, once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused. However,

> "An officer contemplating arrest is not free to disregard exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Kuehl v. Burris*, 173 F.3d 646, 650 (8th Cir. 1999).   An officer cannot "ignore substantial exculpatory evidence" in determining probable cause. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 305-06 (6th Cir. 2005).
>
> *Gregory v. City of Louisville*, 444 F.3d 725, 743 (6th Cir. 2006)

Nichols ignored readily available information that negated the asserted grounds for probable cause. Mr. Hopkins had complied with Nichols' demand regarding the dead cow in the creek (Nichols Depo., 84:1-25).  Grain and hay were available to the cattle and shown to Nichols, providing food supply in addition to the grazing area on the farm. (Hopkins Dec., ¶7;

Exhibit 8 – Photographs of grain/hay), and Nichols testified during the preliminary hearing of the criminal charges against Mr. Hopkins that he saw where Mr. Hopkins was pouring grain out for the cattle. (Hopkins Dec., ¶18; Nichols Depo. Ex. 13, p. 22). Dr. Johnson testified that, even excluding the creek where a deceased cow was found on July 2, ponds and a water trough on the farm provided adequate water supply to the two herds. (Johnson 58:19-60:10). On both July 2, 2018, and July 12, 2018, the Livestock Welfare Examination Form completed by Dr. Johnson failed to include individual body condition scores as an attachment, as required by the form relied upon by Nichols. (Exhibit 4 - 7.2.18 Livestock Welfare Exam Form, 6 - 7.2.18 Animal Identification BCS Chart, 7 - 7.12.18 Livestock Welfare Exam Form). Both the July 2 and July 12 Livestock Welfare Examination forms indicate an "unreasonable failure to provide necessary food, water, care or shelter.'" (*Id*). No allegation was made that Mr. Hopkins failed to provide shelter, and Mr. Hopkins called a veterinarian as instructed. (Hopkins Dec., ¶21).

In light of the readily apparent exculpatory evidence, the obvious faults in the veterinarian's assessment of probable cause, and the failure of Nichols to ascertain the boundaries of the farm for available water sources, the veterinarian's determination of probable cause cannot reasonably be relied upon.

The Defendants' reliance upon *Lowery v Faires,* 57 F.Supp.2d 483, to support their Motion is misplaced. In *Lowery,* a deputy Sheriff and members of an animal rights organization named PALS traveled with a veterinarian to the Lowery farm on November 17, 1993, and the veterinarian found inadequate pasture for Mr. Lowery's cattle herd.[1] On the following day, they returned to the farm and seized approximately 444 cattle without a warrant. The Plaintiffs sued

---

[1] Mr. Lowery had been summoned to General Sessions Court based on a complaint charging him with Livestock Running at Large and Cruelty to Animals in the General Sessions Court in October 1993, the month prior to any entry onto his farm or seizure of his property. (*Lowery* F.Supp.2d 483 at 485-486).

PALS individually and as Deputy Sheriffs of Bradley County for violations of the Fourth, Fifth, and Fourteenth Amendments. *Id.* at 489, 496. In that case, witnesses testified that cattle were entering neighbors land, damaging property, ruining gardens, causing vehicle wrecks, charging people, dying, and citizens had made over 90 complaints. *Id.* at 485. Officers twice attempted to obtain an order from the local General Sessions Court permitting impoundment of the cattle but were denied. *Id.* The *Lowery* court dismissed the Fourteenth Amendment claim because the "danger created by the cattle on Lowery's property presented the Defendants with an emergency situation" and that taking the time for a predeprivation hearing was impractical because it would have exposed the public to danger. *Id.* at 493-494. The Fifth Amendment claim was dismissed based on the Plaintiffs' failure to show that state inverse condemnation law was inadequate.[2] *Id.* Finally, the *Lowery* court dismissed the Unreasonable Seizure claim, stating that the "hazards created by Lowery's wandering cattle created an emergency" which presented an imminent threat to public safety. Id. at 495-496.

While the *Lowery* court found against the plaintiffs, the case is easily distinguishable on the facts and applying its logic leads to the opposite conclusion here. In this case, there was only one complaint; there is no allegation that Hopkins' cattle caused wrecks or presented danger to the public; and the Defendants made no attempt to secure a court order for the seizure. (Nichols Depo, 147:17-20). Nichols does not claim that any exigent circumstance existed when he seized the cattle on July 13. (Nichols Depo., 189:3-7). The process to obtain a warrant in Marshall County may take "two or three hours," and Nichols never encountered problems with reaching a judge for the purposes of obtaining a warrant. (Nichols Depo. 46:19-49:3). Therefore, Nichols could have and should have obtained a warrant prior to seizing the animals. In seeking excuse

---

[2] As noted by the Defendants, the state-litigation requirement no longer applies to Takings Clause claims, per the Supreme Court's ruling in *Knick v. Twp. of Scott, Pa.*, 139 S.Ct. 2162 (2019).

from this failure, the Defendants assert reliance upon a clearly erroneous interpretation of state law.

Tenn. Code Ann. § 39-14-211 states, in pertinent part, that:

(a) No entry onto the property of another, arrest, interference with usual and customary agricultural or veterinary practices, confiscation, or any other action authorized by this part or any other law shall be taken in response to an allegation that this part has been violated with regard to livestock unless, prior to or at the time of such action:
(1) The livestock in question has been examined by:
(A) The commissioner of agriculture or the commissioner's duly authorized agent trained to conduct livestock cruelty examinations;
(B) A graduate of an accredited college of veterinary medicine specializing in livestock practice; or
(C) A graduate of an accredited college of agriculture with a specialty in livestock; and
(2) Upon examination of the livestock, the commissioner, commissioner's agent, or graduate has probable cause to believe that a violation of this part has occurred with regard to the livestock.

Again, the parallel between this statute and the negative rights contained in the Bill of Rights starkly illustrates the error in the Defendants' reasoning. The defendants assert that a "necessary" condition is, instead, a "sufficient" condition when they contend  this statute operates to substitute compliance with the Fourth Amendment in animal cruelty cases with the finding of a veterinarian. [3] "No entry […] confiscation […] or other action authorized by this part or any other law […] shall be taken unless [a veterinarian finds probable cause]" means that a veterinarian's finding is a necessary prerequisite to seizing cattle pursuant to this statute *or any other law*.  The statute does not read "If a veterinarian determines probable cause, livestock may be confiscated," effectively creating a new, independent exception to the warrant requirement.

---

[3] "Veterinarian" is used here as a reference to all individuals listed under T.C.A. §39-14-211(a)(1) for convenience and brevity, in order to avoid repeating each enumerated individual.

Instead, it adds a layer of protection for Tennessee livestock owners *in addition* to compliance with the Fourth Amendment.

The Supreme Court has emphasized over and over again that the mandate of the Fourth Amendment requires adherence to judicial processes. *United States v. Jeffers*, 342 U.S. 48, 51 (1951). Further, searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment —subject only to a few specifically established and well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). No exception applies here. Assertion of a novel, clearly erroneous interpretation of Tenn. Code Ann. § 39-14-211 as "reasonable" provides no basis for extending qualified immunity to Nichols' conduct. This statute does not, and a state statute cannot, purport to carve out a new exception to the Fourth Amendment's warrant requirement.  As the Defendants have failed to establish any exception applies here, the seizure on July 13 violated the Hopkins' clearly established rights.

As the Supreme Court stated in *Horton v. California*, 496 U.S. 128, 136–37 (1990), addressing the warrantless seizure of property as evidence:

> "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be "immediately apparent." [ … ] Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."

In this case, the repeated warrantless incursions onto the Hopkins' farm were not consensual. If the open fields doctrine applied to Nichols' entry onto the farm, Mr. Hopkins' consent would have been irrelevant and it would not have been necessary for him to procure warrants to return

in August (Doc. 041, ¶ 48) for the remaining cattle. Furthermore, it is undisputed that a number of the cattle were in good health, and therefore the "incriminating character" of these cattle could not be readily apparent. The manner of Nichols' seizure of both cattle herds renders it unreasonable in violation of the Fourth Amendment.

The "heartland of the constitutional guarantee" here is the Fourth Amendment right to judicial process prior to the seizure, absent any exception from the Fourth Amendment's general warrant requirement. As this right was clearly established by decades of Supreme Court precedent, qualified immunity does not shield Nichols or Lamb from liability.

   3. **Defendants violated the Fifth Amendment's Taking's clause.**

A government violates the Takings Clause when it takes property without compensation, and the "classic taking [is one] in which the government directly appropriates private property for its own use." *Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015). A property owner may bring a Fifth Amendment claim under § 1983 at that time. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019).

Nichols asked Mr. Hopkins to sign over the cattle to Marshall County on July 13, 2018, but Mr. Hopkins declined. (Doc. 41, ¶ 44). When Marshall County seizes livestock, it sells them and may anticipate making a profit on the transaction if the livestock are not held for an extended period of time. (Lamb 30(b)(6) Depo., 16:19-17:11). The County eventually sold the cattle (Doc. 41, ¶60). Because of the length of time the Hopkins' cattle were held, the County did not make a profit on the cattle. (Lamb 30(b)(6) Depo., 16:19-17:11). The Defendants again rely upon the justification that all cattle were seized as evidence, and this argument has been addressed above.

The Defendants are correct that property must be taken for "public use" in order to establish a takings clause claim. However, the only case relied upon by the Defendants involving government seizure of animals, *Pesce v. City of Des Moines Iowa,* 439 F.Supp.3d 1101, 1116 (S.D. Iowa, 2020), is distinguishable on its facts. In *Pesce,* the district court found no Takings Clause violation because the dogs seized by the defendants were "seized and disposed of" under City ordinances pertaining to the regulation of dogs. *Id.* at 1116. In its holding, the court stated:

> Because Pesce's dogs were seized and disposed of pursuant to the City's police power, it is not a taking of private property for public use, and Pesce is not entitled to compensation under the Takings Clause. *See Porter*, 93 F.3d at 310 (finding no Takings Clause violation in connection with the seizure and disposal of the plaintiff's dog where such actions fell within the state's police power); *Kiyak v. Town of Fairfield*, Civil No. 3:17-cv-1426(AWT), 2019 WL 2895640, at *5 (D. Conn. Mar. 25, 2019) (finding no Takings Clause violation where dogs were seized under a state's dog control statute, which is a **valid** exercise of a state's police power); *Freeman v. Indiana*, Cause No. 1:17-CV-317-TLS, 2019 WL 357051, at *12–13 (N.D. Ind. Jan. 29, 2019) (finding no Takings Clause violation where dogs were seized during a police search of the plaintiff's house pursuant *1117 to a **valid search warrant**, which falls under the state's police powers) (emphasis added).

*Pesce*, 439 F. Supp. 3d at 1116–17.

Two critical distinctions are present in the instant case. First, the seizure of the Plaintiffs' cattle was not pursuant to a valid search warrant or another exercise of the state police powers, for the reasons detailed above. Second, Marshall County stood to profit from the seizure of the livestock. If Mr. Hopkins had voluntarily surrendered the animals to Marshall County as others had done (Nichols Depo., 115:18-116:15) or settled his case within 30-45 days as Nichols had anticipated (Jackson Depo., 21:1-12), the County would have profited. This is precisely the type of activity covered by the Fifth Amendment's Takings Clause – private property taken by government agents and converted to the government's use without just compensation.

Again, Nichols and Lamb's conduct on July 13 in seizing the cattle violated the "heartland guarantee" of the Fifth Amendment because they seized the animals with an expectation of benefit to the government without just compensation, a right clearly established by decades of Supreme Court precedent. Therefore, qualified immunity does not shield them from individual liability.

### C. Defendant Marshall County (as the municipal "official capacity" defendant) is liable for these violations, as the violations were committed pursuant to the official policy, custom, or practices of Marshall County

Lamb has been the elected Sheriff of Marshall County since 2014 and is responsible for determining policy governing animal seizures. (Lamb Depo, 8:19-23; 54:20-22; 58:19-23). Lamb was aware that the seizures were occurring and participated in the July 13 seizure of the Hopkins' cattle. (Lamb Depo., 25:10-18.) The County claims that it had no "official policy" governing the seizure of livestock. (Lamb 30(b)(6) Depo., 18:5-25). The County produced records from all animal cruelty investigations and related animal seizures occurring between 2011 and July 13, 2018, and Nichols was the investigating officer for all of them. (*Id.* at 10:3-25). In all of these cases, Nichols entered the owner's property and seized the animals, and some of the owners immediately relinquished ownership of the animals to Marshall County. (Nichols Depo., 111:19-119:12). Nichols never obtained a warrant prior to entering properties or seizing these animals. (Nichols Depo, 147:17-20). The Sheriff agreed that what Nichols did in these animal cruelty investigations is equivalent to what the Marshall County Sheriff's Department does in these investigations. (Lamb Depo., 58:6-12) The County agreed that the manner in which Nichols conducted these investigations and seizures is the custom of the Marshall County Sheriff's Office. (Lamb 30(b)(6) Depo. at 12:22-13:2). Nichols was Jackson's "only contact"

and made an oral agreement for Jackson to hold cattle seized from the Hopkins farm for five dollars per day, per head. (Jackson Depo, 18:1-21:1).

A local government may be directly liable under 42 U.S.C. § 1983 where the alleged unconstitutional action flows from implementation of official policy, custom, or practice. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978); *Miller v. Calhoun Cty.,* 408 F.3d 803, 813 (6th Cir. 2005). "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiesence in the established practice." *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis,* 361 F.3d 898, 902 (6th Cir.2004). The custom "must 'be so permanent and well settled as to constitute a custom or usage with the force of law.' " *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507 (6th Cir.1996)(quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Such a custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'" *Id.* (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning,* 310 U.S. 362, 369 (1940))." *Miller,* 408 F.3d at 814-15. Authority to make municipal policy may be delegated by an official who possesses such authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Municipal liability attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Id.* at 483.

Here, the facts and circumstances above cited demonstrate that the Sheriff delegated his final decisionmaking authority regarding animal cruelty investigations and related animal seizures to Nichols, and that the manner in which Nichols conducted the seizures is the custom of the Marshall County Sheriff's Office. Nichols, acting with delegated authority from the Sheriff, made a deliberate choice to completely forego judicial process prior to livestock

seizures, including the July 13 seizure of the Hopkins' cattle. Marshall County is therefore liable for all constitutional deprivations both as the result of a deliberate choice by the official responsible for final policy with respect to the subject matter at issue in this case, and because the official custom of Marshall County was to enter private property and seize livestock without judicial process.

## III.    CONCLUSION

For all the reasons stated herein, summary judgment should be denied in all respects. The Plaintiffs have demonstrated that, at a minimum, when construing the evidence in the most favorable light, there exists a genuine issue for trial as to each and every one of the Plaintiffs' claims and the Defendants are not entitled to qualified immunity.

Respectfully Submitted,

/s/ Wesley Clark_____
Wesley Clark, #32611
Frank R. Brazil, #34586
BRAZIL CLARK, PLLC
2901 Dobbs Avenue
Nashville, TN 37211
615-730-8619
615-514-9674 (fax)
wesley@brazilclark.com
frank@brazilclark.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 2, 2020, this document was electronically filed and is expected to be served upon:

Robyn Beale Williams
Destin Tisher
FARRAR & BATES, LLP
211 Seventh Avenue North, Suite 500
Nashville, Tennessee 37219
Phone: (615) 254-3060
Fax: (615) 254-9835
robyn.williams@farrar-bates.com
destin.tisher@farrar-bates.com
*Counsel for All Defendants*


/s/ Wesley Clark____
Wesley Clark