```
 1              IN THE UNITED STATES DISTRICT
                MIDDLE DISTRICT OF TENNESSEE
 2                      AT COLUMBIA
   _____
 3
     STEPHEN MATTHEW HOPKINS
 4   and JULIE R. HOPKINS,

 5         Plaintiffs,

 6   vs.                              Case No.
                                      1:19-cv-00059
 7   ANTHONY "TONY" NICHOLS, in
     his individual and
 8   official capacity, SHERIFF
     WILLIAM "BILLY" LAMB, in
 9   his individual and
     official capacity,
10
           Defendants.
11
   _____
12



13


14


15
              Videoconference Deposition of:
16
              WILLIAM LAMB
17
              Taken on behalf of Plaintiffs
18            August 5, 2020

19

20

21
   _____
22
                  Elite Reporting Services
23              www.elitereportingservices.com
             Lindsey R. Perry, LCR, RPR, CRR, CSR
24                  Post Office Box 292382
                 Nashville, Tennessee  37229
25                     (615)595-0073
```

Case 1:19-cv-00059   Document 48-11   Filed 12/02/20   Page 1 of 79 PageID #: 648
Elite Reporting Services   *   (615) 595-0073
www.EliteReportingServices.com

```
 1   there, approximately?
 2   A.      I think 22.  21, 22.
 3   Q.      And what job did you take after that?
 4   A.      I come to work at the sheriff's office.
 5   Marshall County Sheriff's Office.
 6   Q.      Marshall County Sheriff's Office?
 7   A.      Yes, sir.
 8   Q.      And have you worked at the sheriff's office
 9   there in Marshall County in one capacity or another
10   continuously since that time?
11   A.      Yes, sir.  Mostly I -- I resigned to run for
12   sheriff in 2014, so I was gone for nine months.
13   Other than that, I've been here about 38 years.
14   Q.      So the only interruption was when you were
15   actually running for sheriff?
16   A.      Yes, sir.
17   Q.      And when was that?  When did you first run
18   for sheriff?
19   A.      2014.
20   Q.      And that was the first time you'd run for
21   sheriff?
22   A.      Yes, sir.
23   Q.      And you were elected?
24   A.      Yes, sir.
25   Q.      And you've been in office since then?
```

Case 1:19-cv-00053 Document 48-11 Filed 12/02/20 Page 2 of 9 PageID #: 649
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com

```
1    Q.     Yes, prior to seizing -- searching or
2    seizing property.
3    A.     No, sir.  I've never obtained a search
4    warrant.
5    Q.     Okay.  And what about the next position you
6    held with the Marshall County Sheriff's Office?
7    A.     I was a chief deputy.
8    Q.     What were your job duties as a chief deputy,
9    and can you contrast those with your job duties as a
10   road deputy?
11   A.     Well, yes, that and -- and a lot of it was
12   administrative; overseeing the department.
13   Q.     Okay.  And did you investigate crime or was
14   it primarily an administrative job?
15   A.     Most of it was administrative.
16   Q.     Did you do any investigating?
17   A.     I don't recall.  I possibly could have.  Not
18   to a major extent, no, sir.
19   Q.     Okay.  And how long did you hold that
20   position?
21   A.     23 years.
22   Q.     Okay.  So your job was primarily
23   administrative.
24          What were your administrative duties?
25   A.     Like I said, just overseeing the department
```

```
 1   Q.      Okay.  I guess the way I asked the question
 2   and the way you answered it, you said "no," but it
 3   sounds like your answer is actually "yes" or
 4   "correct" that you never observed detectives or
 5   officers obtain a warrant before searching or
 6   seizing livestock.
 7           Is that accurate?
 8   A.      That's correct.  No, sir.  I -- I've never
 9   seen them obtain one.  No, sir.
10   Q.      Okay.  So you were aware that these seizures
11   were occurring, right?
12   A.      Yes, sir.  Some of them, yes.
13   Q.      Okay.  And you even participated in at least
14   one of them, Mr. Hopkins' seizure, right?
15   A.      Yes, sir.  Well, I don't say "participated,"
16   but, yes, sir, I did leave my house.  It was about a
17   mile or half around the road.  I did go out there
18   and stop by before I come on into the office, so,
19   yes, sir, I guess you could say I participated.
20   Q.      Okay.  I was about to ask.  If you're not
21   participating, what are you doing out there, but...
22   A.      Well, you know, I -- I stopped by just to
23   see what was going on, you know.
24   Q.      To oversee the raid -- or the seizure?
25   A.      Sir?  I didn't hear you.
```

Elite Reporting Services
www.EliteReportingServices.com

1  Q.     To oversee the seizure?
2  A.     No, sir, not to oversee it. Like I say, I
3  wasn't there that long. I just stopped by just
4  to -- like I say, I was on my way to work, and I
5  just run by there. It's a little -- I don't know
6  how long I was there. I wasn't there long probably.
7  Q.     You knew what was going on, though, right?
8  A.     Yes, sir. Yes, sir. I knew they was -- I
9  was -- I believe I was contacted the evening before,
10 and they said they was going out to pick the
11 livestock up.
12 Q.     But that wasn't the first time you were
13 aware of Detective Nichols' investigation into
14 Matthew Hopkins' farm, was it?
15 A.     No, sir.
16 Q.     When was the first time you became aware of
17 the investigation into Matthew Hopkins' farm?
18 A.     I believe -- I don't remember the dates. It
19 was -- I believe it was the day that Captain Oliver
20 and Detective Nichols went up there. I don't know
21 what that date is.
22 Q.     Okay. That was July 9th, according to
23 Detective Nichols.
24        Would that be correct with you? I mean, if
25 that's the day that Oliver and Nichols went out

```
 1   occur?
 2   A.      Best I recall, I believe it was in the
 3   evening.  Late -- late evening.
 4   Q.      And so judges are available to entertain
 5   applications for search warrants from your officers
 6   day and night; correct?
 7   A.      Yes, sir.
 8   Q.      And Detective Nichols could have gotten a
 9   search warrant or applied for a search warrant on
10   July 12th, right?
11   A.      Yes, sir, I guess he could have.  I think he
12   was still operating under, best I remember, what was
13   said.  Mr. Hopkins told him to go on the property
14   and do what he needed to do or something to that
15   effect.  I guess that's what he was operating under.
16   I can't say.
17   Q.      Well, that's what Detective Nichols says he
18   was told, but he said a lot of things about what he
19   was told that didn't seem to line up with an audio
20   recording of that encounter, but we'll address that
21   with him.
22   A.      Yes, sir.
23   Q.      So tell me about exactly what happened when
24   you arrived on the Hopkinses' farm on July 13th.
25   What's the first thing you observed when you pulled
```

1    onto the property?
2    A.    I observed, I think, Detective Nichols and a
3    few more officers there.  I think Drew Binkley was
4    there, is the first thing I observed, and --
5    Q.    I'm sorry.  Go ahead.
6    A.    Some gentlemen showed up at the farm with
7    some trucks and trailers.  And like I say, I wasn't
8    there very long.  There was -- a gentleman was
9    talking to Detective Binkley, and I walked back, and
10   the gentleman -- I guess it was Mr. Hopkins.  I
11   never met Mr. Hopkins before.  He asked me if he
12   could sell the cattle, and I told him that he needed
13   to contact Detective Nichols because it was his
14   case.  At that point, we -- it was just some small
15   talk.  We was just talking, and I left after that.
16   Q.    Did you observe a "no trespassing" sign
17   whenever you turned onto the property?
18   A.    No, sir, I didn't.
19   Q.    And so was this the first time you had
20   participated in one of Detective Nichols' livestock
21   seizures?
22   A.    I could have showed up at one, but I
23   don't -- I don't recall.  I would think the -- that
24   chicken case you talked about a while ago, I think I
25   rode out there.  I think the man's -- I -- seems

1  Q.     Okay.  So what part of that statute relieves
2  the government of the 4th Amendment warrant
3  requirement that we discussed earlier?
4  A.     Well, sir, I'm not a scholar like you, a
5  lawyer, but I think I see two requirements for entry
6  onto the property and to examine the livestock, the
7  way I understand it, and -- you know, for
8  confiscation, which was the examination by the agent
9  of the commissioner and a veterinarian that does
10 livestock cases and that's -- I think it's
11 reasonable to believe that we -- we went by that
12 statute and -- when seizing Mr. Hopkins' cattle.
13 Q.     I understand your contention, but what I'm
14 asking is what part of this statute relieves the
15 state law enforcement agents of the 4th Amendment's
16 warrant requirement, if anything?  Because that's
17 what you're saying, right?  You're saying that if a
18 veterinarian says there's probable cause, you don't
19 even have to get a warrant, right?  That's your
20 argument.  That's -- that's your policy?
21 A.     Well, no, sir, that's not my policy.  That's
22 just the way that I'm interpreting this.
23 Q.     Okay.  So --
24 A.     I'm not a lawyer and I -- you know, I can't
25 sit here and argue that with you.

Case 1:19-cv-00055-DLH-CSM Document 48-11 Filed 12/02/2015 Page 8 of 9 PageID #: 653
Elite Reporting Services (505-205-9079)
www.EliteReportingServices.com

```
1   usually does is what Marshall County Sheriff's
2   Department usually does, right?
3   A.      Yes.  I'm responsible for Detective Nichols.
4   That's the way he's been operating, and I'm
5   responsible for it.  Yes, sir.
6   Q.      So I'm asking that -- whatever
7   Detective Nichols usually does in animal neglect and
8   cruelty investigations is equivalent to what the
9   Marshall County Sheriff's Office usually does in
10  these investigations.
11          Fair statement?
12  A.      Yes, sir.
13  Q.      Okay.  So does it surprise you that other
14  counties still get warrants -- whenever a
15  veterinarian says there's probable cause, they still
16  get a warrant before they seize someone's property?
17  Does that surprise you?
18  A.      I don't know what other counties do.
19  Q.      I thought you said you talked to other
20  sheriffs whenever you were implementing policy or
21  determining policy changes.
22  A.      Yes, sir.  I don't ever remember discussing
23  livestock.
24  Q.      So does that mean you just inherited
25  whatever policy that existed before you came into
```

Case 1:19-cv-00059-it Document 18-11 Filed 12/02/2015 Page 9 of 9 PageID #: 656
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com