# HOPKINS

# vs.

# NICHOLS, et al.

## 30(b)(6)

# WILLIAM LAMB

## August 05, 2020



Elite Reporting Services

Celebrating 29 Years of Reporting Excellence!

Lindsey R. Perry, LCR, RPR, CRR, CSR
Associate Reporter

Chattanooga (423)266-2332  Jackson (731)425-1222
Knoxville (865)329-9919  Nashville (615)595-0073  Memphis (901)522-4477
www.elitereportingservices.com

1  shall file a TIBRS report and refer a copy of the
2  report to the investigative division of the Marshall
3  County Sheriff's Office," right?
4  A.    Yes, sir.  That's what it says.
5  Q.    So there -- is there any other written
6  policy that applies to the endangered or mistreated
7  animals calls to the Marshall County Sheriff's
8  Office?
9  A.    Not that I'm familiar with, no, sir.
10 Q.    And using Mr. Hopkins' case as an example,
11 would that be an endangered or mistreated animals
12 call?
13 A.    Yes, sir.
14 Q.    And we discussed in your individual
15 deposition that Detective Nichols is the detective
16 responsible for conducting investigations into
17 animal neglect and cruelty; is that correct?
18 A.    He conducts most of them.
19 Q.    Most of them?
20 A.    Yes, sir.
21 Q.    Okay.  Is it -- in the last 10 years, based
22 on the documents you produced, he conducted all of
23 those, right?
24 A.    Yes, sir.  There could be some come through
25 I'm not aware of, as far as some other type animal,

Case 1:19-cv-00059 Document 43-12 Filed 12/02/20 Page 2 of 10 PageID #: 658
Elite Reporting Services
www.EliteReportingServices.com

 1  but, yes, sir, Detective Nichols handles all those
 2  type.
 3  Q.      Okay.  Are you aware of any -- let me pause
 4  for a second, and I'll make an Exhibit 2.  Exhibit 2
 5  will be the seizures of livestock document that we
 6  received from the county in discovery in this case.
 7  And let me share that.
 8          (WHEREUPON, a document was marked as
 9  Exhibit Number 2.)
10  BY MR. CLARK:
11  Q.      So out of all of these seizures that were
12  produced, they all say Detective Nichols was the
13  investigating officer.
14          Are you aware of other incident reports
15  pertaining to animal cruelty or neglect in the last
16  10 years?
17  A.      No, sir.  Not that I can recall.
18  Q.      Okay.  So to the best of your knowledge,
19  that is a complete production of the incident
20  reports pertaining to animal cruelty or neglect for
21  a 10-year period in Marshall County?
22  A.      To my knowledge, yes, sir.
23  Q.      Okay.  So make Exhibit -- 2 was the
24  seizures.  Exhibit 3 will be the interrogatory
25  responses by Defendant Marshall County, and I'm

Case 1:19-cv-00059 Document 43-12 Filed 12/02/2015 Page 3 of 10 PageID #: 659
Elite Reporting Services
www.EliteReportingServices.com

```
 1   going to go ahead and drop that into the chat.
 2               (WHEREUPON, a document was marked as
 3   Exhibit Number 3.)
 4   BY MR. CLARK:
 5   Q.      So in response to the interrogatories we
 6   asked of the county, the first question asked you to
 7   identify all policies applicable to the seizure of
 8   livestock or farm animals by officers of the
 9   Marshall County Sheriff's Department during the time
10   period beginning January 2013 through the present
11   date.  And the response was that "The county does
12   not have a specific policy regarding the seizure of
13   any animal responsive to this interrogatory;
14   however, the general procedure is attached as
15   Exhibit A," and that Exhibit A we have just made
16   into Exhibit 1 to this deposition, the policy and
17   procedures animal complaint protocol.
18           Now, is there any other document or policy
19   responsive to this interrogatory that you're aware
20   of, Sheriff?
21   A.      No, sir.  Not that I'm aware of.
22   Q.      Okay.  So in Number 2 I asked you to
23   "Identify and describe all customs or practices of
24   the Marshall County Sheriff's Department, written or
25   unwritten, which applied to the seizure of livestock
```

Case 1:19-cv-00059 Document 43-12 Filed 12/02/20 Page 4 of 10 PageID #: 660
Elite Reporting Services
www.EliteReportingServices.com

1 during the year 2018. If any such customs or
2 practices changed during the year 2018, identify the
3 date of the change and articulate each iteration of
4 each custom or practice."
5      The county responded that "The county does
6 not have a specific policy regarding the seizure of
7 any animal responsive to this interrogatory."
8      So I'm asking about customs or practices.
9 Do you know what a custom or practice is, Sheriff?
10 A.    Yes, sir.
11 Q.    Okay. So is it fair to say that a custom is
12 the way something is usually done at the sheriff's
13 department?
14 A.    Yes, sir.
15 Q.    Okay.
16 A.    Yes, sir.
17 Q.    And Detective Nichols is the detective that
18 usually -- or, based on the documents we have, has
19 always conducted these investigations since 2013;
20 correct?
21 A.    That's correct.
22 Q.    And so it's fair to say that the manner in
23 which Detective Nichols conducted these
24 investigations and seizures is the custom of the
25 Marshall County Sheriff's Office.

1   Fair statement?
2   A.   Yes, sir.
3   Q.   So we asked in Interrogatory Number 3 to
4   "Identify all contracts, agreements, and/or other
5   understandings between Marshall County and any third
6   party relating to the care, upkeep, or maintenance
7   of livestock seized by law enforcement applicable at
8   any time during the year 2018."
9        The county responded that "The county had a
10  verbal agreement with Phil Dunivan to maintain and
11  care for cattle seized from Don Farler," and "The
12  county had a verbal agreement with Bo Jackson to pay
13  $5/head per day to treat, maintain, and care for the
14  cattle.  Originally it was believed that Mr. Jackson
15  would only need to hold the cattle for 30-45 days;
16  however, this was extended."
17       Sheriff, there's no written agreement with
18  Bo Jackson regarding the livestock that were seized
19  from Mr. Hopkins' farm; correct?
20  A.   Not that I'm aware of, no, sir.
21  Q.   So you'd never met Bo Jackson before this --
22  A.   No, sir, I -- no, sir.  I didn't know
23  Bo Jackson.
24  Q.   So Detective Nichols made that verbal
25  agreement with Bo Jackson, right?

Case 1:19-cv-00059 Document 43-12 Filed 02/02/2015 Page 6 of 10 PageID #: 662
Elite Reporting Services
www.EliteReportingServices.com

1  done like this.
2  Q.    Okay.
3  A.    We have to have a place to put them.  If we
4  have to put out bids -- put it through bids and that
5  sort of thing, it would take a while, and it was
6  hard to find anybody to help us out on this type
7  stuff.
8  Q.    Are there other areas aside from livestock
9  holding where Detective Nichols is authorized to
10 make verbal financial agreements binding the county?
11 A.    No, sir.
12 Q.    Okay.  Are there any other circumstances
13 you're aware of where an employee of the sheriff's
14 office is permitted to make verbal financial
15 agreements that bind the county?
16 A.    No, sir.
17 Q.    Has the Marshall County Commission approved
18 or passed a resolution that authorizes employees to
19 make these verbal financial agreements that bind the
20 county?
21 A.    I -- not that I'm aware of.
22 Q.    So in response to Interrogatory Number 4
23 "Identify any documentation which reflects income
24 derived, directly or indirectly, by Marshall County
25 (including the Marshall County Sheriff's

Case 1:19-cv-00059 Document 43-12 Filed 12/02/20 Page 7 of 10 PageID #: 663
Elite Reporting Services 615-595-0073
www.EliteReportingServices.com

Department), from any third-party contracts related to the care, upkeep, and/or maintenance of livestock seized by law enforcement since July 1, 2013," and the county's response was "Not applicable."

Does that mean that there is no documentation which reflects such income?

A. We haven't received anything from a third party. We haven't received any income from a third party.

Q. Marshall County didn't receive any income from Matthew Hopkins?

A. I thought you was talking about a third party related -- like Bo Jackson or Phil Dunivan.

Q. Well, directly or indirectly from any third-party contracts related to the care, upkeep, and/or maintenance of livestock. So I understand it's a pretty wordy question, but you can tell me about it now.

How does the financial arrangement work whenever someone is holding livestock that have been seized by Marshall County? How does that work?

A. It -- the way it works, it goes through court, the cattle or whatever are sold, then we take out -- what we do is we take out what the upkeep is, and the money is put into the general fund. If

Case 1:19-cv-00059 Document 43-12 Filed 12/02/2015 Page 8 of 10 PageID #: 664
Elite Reporting Services
www.EliteReportingServices.com

```
 1   there's any left, the money is put into the general
 2   fund.  In Mr. Hopkins' case, that wasn't quite the
 3   case.  The county paid, I think, about $17,000.
 4   Q.       And that's because the cattle were held a
 5   lot longer than 30 to 45 days, right?
 6   A.       Yes, sir.  That's correct.
 7   Q.       So if the cattle were not held for that
 8   long, the county could anticipate making a profit on
 9   these transactions.
10            Fair statement?
11   A.       Yes, sir.
12   Q.       And how is that -- how is that amount
13   determined -- is any amount that is not expended on
14   the upkeep placed directly in the general fund?
15   A.       Yes, sir.  Whatever comes out of that as far
16   as the upkeep, the vet fees, and the rest of it,
17   it's put into the general fund.
18   Q.       Okay.  Does any of the money go to any other
19   destination?
20   A.       I -- not that I'm aware of.
21   Q.       So the --
22   A.       I don't know -- I don't know where it goes
23   from there.
24   Q.       Right.  But aside from the general fund, it
25   doesn't go anywhere else initially; correct?
```

Case 1:19-cv-00059 Document 43-12 Filed 12/02/2015 Page 9 of 10 PageID #: 663
Elite Reporting Services
www.EliteReportingServices.com

```
 1   A.      No, sir.  Correct.  Not that I'm aware --
 2   yes, sir.
 3   Q.      Okay.
 4   A.      Not that I'm aware of.
 5   Q.      So in response to Interrogatory Number 5, we
 6   asked "Do you contend that all seizures of the
 7   plaintiffs' livestock in 2018 were consistent with
 8   the official policy of the Marshall County Sheriff's
 9   Department," and in addition to objecting that this
10   interrogatory is overly broad and vague as to what
11   is meant by "official policy," the county goes on to
12   state that the county had no policy with regard to
13   the seizure of livestock.
14           Is that still the county's response to this?
15   A.      Yes, sir.
16   Q.      And then in response to Number 6 "Do you
17   contend that all seizures of the plaintiffs'
18   livestock in 2018 were consistent with all the
19   customs or practices of the Marshall County
20   Sheriff's Department?  Provide your reasoning in
21   support of your response."  The county says "The
22   county had no custom or practice regarding the
23   seizure of livestock."
24           Is that still the county's response to this
25   interrogatory?
```

Case 1:19-cv-00058... Document 48-12 Filed 12/02/20 Page 10 of 10 PageID #: 666
Elite Reporting Services
www.EliteReportingServices.com