IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| **Stephen Matthew Hopkins, Et Al.** ) | |
| ) | |
| **Plaintiffs,** ) | Case No. 1:19-cv-00059 |
| ) | |
| v. ) | |
| ) | Judge Campbell |
| **Anthony (Tony) Nichols, et al.,** ) | |
| ) | Magistrate Judge Holmes |
| **Defendants.** ) | |

### PLAINTIFFS' EXPERT WITNESS TESTIMONY: DR. JANIE BERRYMAN

Come now Plaintiffs, by and through Counsel, and submit the following anticipated direct testimony recitation for their expert witness, Dr. Janie Berryman, as directed by the Court. (ECF 132, Order, at 3); LR 39(c)(5)(E). Dr. Berryman will testify to the following:

Good [morning/afternoon]. My name is Dr. Janie Berryman. I am a licensed psychologist. I have been licensed as a psychologist in the State of Tennessee since 1996. I have never been disciplined as a professional. I earned my Doctorate in Education from Tennessee State University in 1996, and prior to that earned my bachelor's and master's degrees from Northwestern State University of Louisiana. I have owned a private psychology practice, "Berryman & Associates," since June of the year 2000. My firm provides psychological services. Approximately half of the psychology services I provide are therapeutic services, while the other half are evaluations related to court proceedings.

In terms of evaluations for court proceedings, I am retained by plaintiffs and defendants at a roughly "50/50" rate. I recently ended a twenty-year contract with the Department of Children's services through which I provided evaluations in connection with child neglect and

1

termination of parental rights proceedings.  In terms of the process of how this works, I am retained by an attorney to conduct an evaluation for their case and then, after the evaluation is complete, the attorney decides whether or not to call me to testify.  I charge $250 per hour for my services, except when I am working for the State of Tennessee or Department of Children's Services in which case the rate is $150 per hour.

    The opinions that I develop from a clinical evaluation are within a reasonable degree of certainty within the profession of psychology.  I utilize tools and procedures that are consistent with other peers.  Peer review has been consistent that these are the adequate ways of obtaining information.  I also utilize the DSM-5, the Diagnostic and Statistical Manual, Number 4, which is like the Bible of diagnosis for the profession.  The DSM-5 Number 4 is also peer-reviewed, and is very sound in terms of making conclusions for criteria for diagnoses.  When I conduct an evaluation, I utilize all of the above to develop an opinion about my subject within a reasonable degree of medical certainty.  I feel that I have an ethical and legal obligation to render objective opinions when I conduct these evaluations.  At times, attorneys that retain me to conduct evaluations ultimately choose not to call me to testify, where the evaluation that I have provided may not be helpful to them.

    In the Hopkins case, I was retained by the Hopkins's legal team to conduct a psychological examination of the Hopkins family to assess the degree of emotional harm suffered by them from having their cattle taken by the Marshall County Sheriff's Office.  To complete this evaluation, I conducted thorough clinical interviews of Mr. Hopkins, Mrs. Hopkins, and their son Samuel as well as conducting psychological testing on all three of them.

In the clinical interviews, I asked them to relate their personal history from the time that they were born, through their childhood, whether they were ever exposed to domestic violence, drug abuse, or any other kind of abuse of a physical, emotional, or sexual nature. I'm looking at childhood history, family dynamics, any kind of history of childhood trauma or abuse or experiences that might have affected one's adulthood. I am particularly looking for "adverse childhood experiences," which have become the focus in contemporary psychology.

In terms of the testing I conducted on Mr. and Mrs. Hopkins, I conducted the Personality Assessment Inventory, a State-Trait Expression Inventory-2, a Trauma Symptom Checklist-2, and the Incomplete Sentence Blank. The testing is multiple choice, and I set them up in a separate room and let them fill that out themselves. I then evaluated the answers they gave on each of the testing instruments, in accordance with the professional standards of the psychology profession.

The Personality Assessment Inventory covers a whole spectrum of things such as depression, anxiety, social skills, and delusional thinking. It covers alcohol and drug questions. It gives a full battery or scale to kind of come up with just an overall picture of the people, like interpersonal skills, self-report on how they feel about themselves, self-concept, and any kind of mental health diagnoses that may be relevant. The test also includes validity scores, meaning Basically, are they being honest and are they being forthright as opposed to being defensive.

The State Trait Expression Inventory-2 is an anger management scale, just asking how they feel currently regarding anger, how they generally feel, and how do they handle their anger.

The Trauma Symptom Checklist, it's looking at a variety of different kinds of trauma responses from people, and it covers a variety of things including sexual abuse and other kind of physical abuse and so forth and so on, as well as emotional abuse.

The Incomplete Sentence Blank is a series of sentence stems like, I like, "I'm afraid of," and you finish writing the sentence with the first thing that pops in your head. It just gives me something a little bit less box-checking and multiple choice. It gives a little bit of insight into the person's expression and just what is on their mind. The questions are open ended, and I just tell clients to put the first thing that pops in their head, not to overthink, just put the first thing that pops in.

I conducted my evaluation of the Hopkins family over the course of several appointments. I did an initial two-hour intake interview with Mr. and Mrs. Hopkins on March 18, 2020. On April 9, 2020, I spent one hour with Samuel, conducting a clinical interview and psychological testing. On April 16, 2020, I met with Mr. and Mrs. Hopkins again and conducted eight hours of psychological testing on them and two hours of additional clinical interviews with them. While one was doing testing, the other was doing the clinical interview. On April 29, 2020, I spent another hour with Samuel for additional clinical interviewing and testing. On May 7, 2020, I spent another hour with Samuel doing an additional clinical interview. On May 20, 2020, I spent two hours with Mr. and Mrs. Hopkins family doing follow-up clinical interviews. I also spent two hours interviewing their collateral contact references. Finally, I also reviewed Mrs. Hopkins's diary entries, which were provided to me.

With regard to Mr. Hopkins, he has experienced a total shift in his belief system, feeling that he has been violated and that no one cares. Because of this experience, Mr. Hopkins no longer trusts law enforcement and feels that he may never trust law enforcement again. Mr.

4

Hopkins has experienced a great deal of shame and confusion from this. Mr. Hopkins sold the family home and farm and moved out of Marshall County because of what the Sheriff's Office did to him. When he has had to return to Marshall County to take care of business, he has felt afraid that the Sheriff's Office would retaliate against him. Mr. Hopkins has had problems sleeping and suffered from nightmares since the incident. He has lost weight since the incident. Mr. Hopkins's consumption of alcohol became an issue after the incident. He never had an issue with alcohol prior to the incident. Prior to the cattle seizure, he would have Jack Daniels and a Coke maybe three times a week or less at night, after the children would have gone to bed. After, he was starting to drink more frequently. He said he never really got drunk, and it did not create an issue outside the home or with work. He just felt like he was drinking too much on a nightly basis just trying to stop thinking and trying to get some sleep. At his worst he consumed a 1.75 liter bottle per week. He said he never really got drunk, and it didn't impair his work, but he did feel it was more than he should drink. During all of our interviews Mr. Hopkins expressed feelings of lack of trust and faith in the government, feeling like he had been treated unjustly. You know, Matthew becomes very impassioned when he's talking about these issues. It is very evident that it evokes an emotional response in him just having to recount these things and talk about them. It is still a source of difficulty for him.

In testing, Mr. Hopkins's validity scores fell in the normal range, meaning that his test results are accurate – he didn't make himself look better or worse than the clinical picture would warrant. His tests showed elevated anger and increased alcohol use as a result of the cattle seizure incident. In the Incomplete Sentences Blank, a lot of Mr. Hopkins's responses reflected the experiences that the Hopkins family has been through, particularly with the sheriff's

department. However, not all of Mr. Hopkins's responses were negative. There were some very positive things in his life. For example, "The best love of my life is my wife."

Mr. Hopkins is very focused on family and being outdoors. He feels a lot of concern about mistrust of the system, feeling like the system has failed him and that, in turn, this has caused him to fail his family. He is angered by the police. He has trouble with sleep. He has recurrent thoughts of what has occurred and I think a feeling of complete loss of trust in the government and failed justice system. That was an ongoing theme throughout this entire evaluation for him.

Based on the interviews and testing, Mr. Hopkins met the clinical criteria for a diagnosis of Post-Traumatic Stress Disorder. This means that an event is causing continued distress and emotional upheaval, so to speak, on a daily basis -- not on a daily -- on a regular basis. He has recurrent thoughts, still having some trouble eating, trouble sleeping – especially the trouble sleeping. He has recurrent experiences of feeling a surge of emotion, feeling like he is being followed, that he can't go through a certain town without seeing police cars everywhere. He feels targeted.

With regard to Mrs. Hopkins, my clinical background interview showed that she had a pretty traditional family. Her parents were divorced, but she seemed to have a positive relationship with both parents in the long run. Mrs. Hopkins did not have a history of any kind of childhood trauma, or trauma during adolescence. Her parents' divorce did not seem to cause any real major issue for her. Mrs. Hopkins was a good student in school, and she went on to college. Mrs. Hopkins had a steady work history, and she got her master's degree in Oklahoma. Mrs. Hopkins ended up moving to Nashville, and she met Matthew through a job site. Mr. and Mrs. Hopkins got married after a conventional, positive courtship, and they went on to have two

kids. Mrs. Hopkins homeschools their two children. Overall, Mrs. Hopkins had a very much traditional history for the most part without any real major pinpoints of trauma or upheaval until the incident with the sheriff's department.

In terms of Mrs. Hopkins's testing, she had positive validity scores, meaning that she did not do anything to make herself look better or worse. Mrs. Hopkins is straightforward and honest, not defensive at all. Her testing did show some elevations about maladaptive behavior patterns to control anxiety. By "maladaptive," I mean not handling her anxiety quite well, feeling overwhelmed by it. For instance, she resorted to the Mood Plus supplement that her doctor had recommended, trying to find a way to help with her anxiety.

A trauma event was specified on Mrs. Hopkins's testing, which, again, the only one she's really had is dealing with the seizure of property from the sheriff's department. So, Mrs. Hopkins's test scores did reflect that traumatic event. Mrs. Hopkins is more of an emotional person, expressing her feelings. She was quite tearful throughout parts of the interviews with me. Overall, her self-concept is positive and stable. Mrs. Hopkins is normally a confident, optimistic person approaching life with a clear sense of purpose and distinct convictions. That tends to make her more resilient and adaptive in the face of most stressors. She's reasonably satisfied with who she is and what her goals are. She doesn't seem to be a very social person. She's more withdrawn and introverted. She's not really interested -- again, not a social-butterfly type of person. She tends to be passive in relationships. Can be friendly if she wants to, but probably chooses not to be. More passive and distant in relationships that are maintained.

Mrs. Hopkins's Trauma Symptom Inventory-2 was consistent with her Personal Assessment Inventory in showing a past traumatic event. The test reflected a "moderate" level of trauma from the event. "Moderate" is basically -- it's above normal, but it's not in a significant,

extreme manner. It could be worse. It could be worse. It could be better. Her emotional level is manifesting itself more in anxiety as opposed to anger, so to speak, but she does have a little bit of anger. But Mrs. Hopkins has more anxiety, a lot of worry, a lot of rumination, she can't stop thinking about stuff, she's worried for what's going to happen next.

Mrs. Hopkins's answers in the Incomplete Sentence Blank showed that she is very positive about her family and her marriage. Her greatest fear is losing her three guys. She enjoys spending time with family. She does indicate things like, "I feel anxious," "My nerves are often tense," "I can't relax well," "I suffer from migraines," "The future still gives me anxiety," "Sometimes I get agitated." She also kind of reflected on corruption and the evil corruption in world. Mrs. Hopkins noted that she wished Nichols and Lamb would lose their jobs and that their deeds would come to light. She reflected that she was worried that people would avoid them once they find out what the Hopkins's have been through – indicating a fear of retaliation, so to speak.

Overall, Mrs. Hopkins has suffered from ongoing anxiety, anger, and a constant feeling of dread since the cattle seizure. She has had problems sleeping and with nightmares, and has lost weight since the incident. Mrs. Hopkins has suffered from diarrhea when she eats. To help deal with her anxiety from the cattle seizure, Mrs. Hopkins began taking a supplement recommended by her doctor called "Mood Plus."

Like Mr. Hopkins, Mrs. Hopkins also met the criteria for a diagnosis of Post-Traumatic Stress Disorder. She had never experienced a significant traumatic event prior to this incident. Since then, she has recurrent, involuntary, intrusive, distressing memories of the seizing of the cattle and some of the intimidation that followed after. None of these things were present prior to the cattle seizure incident. Since then, Mrs. Hopkins has continued to feel like, "What's going

to happen next?" Both Mr. Hopkins and Mrs. Hopkins have experienced prolonged psychological distress at the exposure of internal and external cues that symbolize or resemble an aspect of the traumatic event, such as having to continue in court and gather information for the lawsuit. They have experienced physiological reactions, which include the lack of sleep and digestive issues for Julie. Both have had nightmares. Both have lost weight early on because of the stress. Matthew has exhibited some irritable behavior and some anger when he is typically not that type of person. He does acknowledge that he has drunk more, and this can be included in the reckless or self-destructive behavior category. They both have had problems with concentration and sleep disturbance. Both Mr. and Mrs. Hopkins felt intimidated and threatened enough that they moved their entire family out from the county due to their fear of other possible retaliation from law enforcement or government agencies, such as DCS. They felt that they were kind of under scrutiny all the time from the local people.

With regard to their children, Mr. and Mrs. Hopkins seem to take a great deal of effort to keep them out of the situation, and with Samuel in particular they tried to keep him sheltered from what has been going on. But, it seems like with the amount of anxiety they are under, the children have picked up on some of their distress.

In particular, their son Samuel has experienced negative emotional reactions due to the cattle seizure and the impact of the seizure on his parents. Since the incident, Samuel has exhibited fear and aggression toward law enforcement officers, in particular toward a security officer at the family's church. Samuel has expressed that police officers are the "bad guys." Samuel was particularly startled by the Sheriff's Department coming to the Hopkins's home and taking their cattle. He has had some involuntary and intrusive distressing memories where he will spontaneously bring up events, particularly with his avoidance and aggressive behavior with

law enforcement individuals. During the clinical interviews, Samuel made several comments about the police coming and taking their cattle, and that this was a bad thing. Samuel was also still afraid that the police were going to come get him and his brother next. Samuel felt better when they moved because they were further away from everybody, but he had that feeling that they were going to come get him next during that process.

In terms of testing, I conducted several psychological tests on Samuel. Because of Samuel being only seven years old, I read the questions aloud and then wrote down his answers for him. One test was the Child Depression Inventory-2, which looks for symptoms of depression, sadness, and poor self-esteem. Another test I conducted on Samuel was the Incomplete Sentence Blank, which again is a series of sentence stems like, I like, "I'm afraid of," and you finish writing the sentence with the first thing that pops in your head. A third was the Trauma Symptom Checklist, which again is looking at a variety of different kinds of trauma responses from people, and it covers a variety of things including sexual abuse and other kind of physical abuse and so forth and so on, as well as emotional abuse. Finally, Samuel also completed the Revised Child Manifest Anxiety Scale.

I also conducted two collateral contact interviews regarding Samuel. Bob Davidson is a staff member at Triune Baptist Church. He is the head of security. Mr. Davidson participated in a phone interview about his observations of Samuel. He described he had hired the Williamson County Sheriff's Department to help with security at church. Mr. Casey Anthony was a gentleman who was in uniform at the church. He describes Samuel coming from Sunday School into the church building. Mr. Anthony was in the foyer. Samuel freaked out when he saw the police officer. This occurred a couple of times. On one occasion Samuel tried to kick Officer

Anthony when he felt threatened. Officer Anthony did go out of his way to help Samuel be calm and realize he was on his side and was not going to harm him in any kind of way.

Gary Price also participated in a phone interview. He described that he taught the class that Samuel took on Wednesday night at church. He described Samuel as being somewhat sensitive, easily intimidated, and upset easily, especially after the seizure incident. After the cattle incident, he was with Samuel when they saw a motorcycle wreck that had police and ambulances. When Samuel saw the blue lights flashing, he freaked out that someone was going to get arrested. Mr. Price reported that Samuel felt very intimidated by the sight of the police, but that he was able to calm Samuel down. He described that Samuel would talk about the police taking their cattle all the time and called the police "the bad guys."

Samuel's emotional distress from this incident has caused Mr. and Mrs. Hopkins to worry about his emotional well-being.  Overall, I think this family still is having some difficulty with closure on this whole event, feeling they were unjustly treated and persecuted, still feeling hypervigilant, even to the point now of when they drive through Marshall County.  In terms of the mistrust of law enforcement that the family has developed because of this incident, I think for the adults, of course Marshall County is more targeted.  They feel like they're more targeted by them.  For Samuel, it's kind of every – all cops, in his way of saying it.  I do think that for the Hopkins the system, though, and Marshall County is just a part of the bigger system, and the government, which is, you know, everywhere.  So I think that for the Hopkins family it branches out into a more systemic mistrust of everything.  I saw -- one of the last appointments I saw with Julie, she had come from there and felt like a car had followed her, and she was in tears when she got to my office.  I think the litigation is a means to help try to get some closure for them.  I think having some conclusion one way or the other will help move toward healing for them.

Finally, let me note that the opinions that I have developed about the Hopkins family from my evaluation are within a reasonable degree of certainty within the profession of psychology. I've utilized tools and procedures that are consistent with other peers. Peer review has been consistent that these are the adequate ways of obtaining information. I utilized the DSM-5, the Diagnostic and Statistical Manual, Number 4, to reach my diagnosis of Post-Traumatic Stress Disorder. Utilizing all the above, I feel that my opinions about the Hopkins family are within a reasonable degree of medical certainty. I also feel that I have an ethical and legal obligation to render objective opinions in this case, and that is what I have done here.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
2901 Dobbs Ave.
Nashville, TN 37211
T: (615) 429-4717 / F: (615) 229-6387
E: kyle@relentlesslaw.com


FRANK R. BRAZIL, #34586
BRAZIL CLARK, PLLC
2901 DOBBS AVE
NASHVILLE, TN 37211
T: (615) 730-8619 / F: 615-514-9674
frank@brazilclark.com


WESLEY CLARK, #32611
BRAZIL CLARK, PLLC
2901 DOBBS AVE
NASHVILLE, TN 37211
T: (615) 730-8619 / F: 615-514-9674
wesley@brazilclark.com

## CERTIFICATE OF SERVICE

I hereby certify that on **May 9, 2023** a copy of the foregoing **Dr. Berryman Expert Witness Testimony** was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to each of the parties on the electronic filing receipt, including **Robyn Williams**, **Counsel for Defendants,** at robyn.williams@farrar-bates.com and **Frank Brazil and Wesley Clark**, **co-counsels for Plaintiffs,** at frank@brazilclark.com and wesley@brazilclark.com. Parties may access this filing through the Court's electronic filing system.

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953